```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - -
                                      )
 5     UNITED STATES OF AMERICA,      )
                                      )
 6                                    )   CRIMINAL ACTION NO.
       v.                             )   2:19po401
 7                                    )
       LARRY G. CHILDERS,             )
 8                                    )
            Defendant.                )
 9  - - - - - - - - - - - - - - - - - -

10

11

12                  TRANSCRIPT OF PROCEEDINGS

13                     Norfolk, Virginia

14                     December 4, 2019

15

16  BEFORE:  THE HONORABLE ROBERT J. KRASK
             United States Magistrate Judge

17

18  APPEARANCES:

19          UNITED STATES ATTORNEY'S OFFICE
            By:  Dee Sterling
20               Assistant United States Attorney
                 Counsel for the United States
21
            STEPHENS & ROBERTS
22          By:  J. Stephen Roberts
                 Counsel for the Defendant
23

24

25
```

JODY A. STEWART, Official Court Reporter

```
 1                    I N D E X

 2   GOVERNMENT'S
     WITNESSES                                    PAGE
 3
       ZACHARY R. HOWLETT
 4          Direct Examination By Ms. Sterling      8
            Cross-Examination By Mr. Roberts       42
 5          Redirect Examination By Ms. Sterling   71
            Recross-Examination By Mr. Roberts     79
 6          Redirect Examination By Ms. Sterling   82
       CHRISTOPHER LEE MENA
 7          Direct Examination By Ms. Sterling     87
            Cross-Examination By Mr. Roberts      100
 8

 9

10                  E X H I B I T S

11   GOVERNMENT'S
     NO.          DESCRIPTION                     PAGE
12
       1          Map                              84
13     2          Photograph                       84
       3          Photograph                       84
14     4          Photograph                       85
       5          Photograph                       83
15     6          Seed samples                     41
       7          Photograph                       42
16     8          Photograph                       98

17

18

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter

```
 1              (Hearing commenced at 9:48 a.m.)
 2              THE CLERK:  United States of America versus Larry
 3    G. Childers, case number 2:19po401.
 4              Are counsel ready to proceed?
 5              MS. STERLING:  Your Honor, the government is ready.
 6    I would advise the Court that this is going to be a trial.
 7    I don't know if the daily docket is close to be completed,
 8    but this could take us a little while if the Court wanted
 9    to --
10              MR. ROBERTS:  We are ready, Your Honor.  I have the
11    forms required of my client.
12              THE COURT:  Very well.  I'm just wondering whether
13    we should try and get through the rest of the docket.
14              Mr. Cole, what is your assessment of how long it
15    will take to deal with -- I know we have some other guilty
16    pleas.
17              MR. COLE:  Your Honor, it probably should take me
18    the 10, 15 minutes more.
19              THE COURT:  Let's do that.
20              MR. ROBERTS:  Yes, sir.
21              THE COURT:  Let's complete the docket.
22              MR. ROBERTS:  May I present these to the Court?
23              THE COURT:  You may.  The court security officer
24    will get them.
25              MR. ROBERTS:  Thank you, Judge.
```

```
 1              (Recess from 9:49 to 10:21 a.m.)

 2              THE CLERK:  United States of America versus Larry

 3    G. Childers, case number 2:19po401.

 4              Are counsel ready to proceed?

 5              MR. ROBERTS:  We are.

 6              MS. STERLING:  The Government is ready.  Your

 7    Honor, before we begin, I just wanted to -- I'm quite

 8    certain I did this but not absolute certain, the last time

 9    we were here on the initial -- on this case in the initial

10    appearance, make sure that the Court is aware that I did

11    amend the violation notice to allege the offense.  It's

12    under 16 U.S.C. 704(b)(1).

13              It originally read 703.  It should have been 703 et

14    seq. Migratory Bird Treaty Act but more -- 704(b)(1) is the

15    specific statutory reference.

16              THE COURT:  All right.  Let me get to -- or just

17    get the violation notice.  So you're moving to amend the

18    charge to Title 16, United States Code Section 704(b)(1)?

19              MS. STERLING:  That's correct.  I thought I had

20    done that last time but that is what I do want to do.

21              THE COURT:  Any objection to that, Mr. Roberts?

22              MR. ROBERTS:  No, sir.  We were made aware of that,

23    and we do not object.  I think that accurately reflects the

24    government's allegation.

25              THE COURT:  Give me just a moment to reflect the
```

1    revised charge.  Is the remainder of the charge that refers
2    to the related Code of Federal Regulation --
3              MS. STERLING:  That's correct.
4              THE COURT:  -- that remains?
5              MS. STERLING:  20.21 sub-section 9, that's correct,
6    Your Honor.
7              THE COURT:  Very well.  All right.  If you both
8    will come to the podium.
9              Good morning again.  Are you, is it Childers?
10             THE DEFENDANT:  Childers, yes, sir.
11             THE COURT:  I'm sorry?
12             THE DEFENDANT:  Childers.
13             THE COURT:  Are you, in fact, Larry Childers?
14             THE DEFENDANT:  Yes, I am.
15             THE COURT:  Mr. Childers, you're before the Court
16   today, as you know from your prior appearance, because you
17   are charged with taking or attempting to take migratory game
18   birds by aid of baiting, or on or over baited areas where
19   you knew or reasonably should have known that the area was
20   or had been baited.
21             That's an offense in violation of Title 16, United
22   States Code Section 704(b)(1), as well as the corresponding
23   regulations implemented to carry out that particular code
24   section, which are contained at 50 Code of Federal
25   Regulations Section 20.21(i).  That is an offense that is

```
 1    a -- I believe it's a class B misdemeanor.  It carries the
 2    following penalties:  Up to six months in jail, the fine of
 3    up to $15,000, you'd have to pay a $10 special assessment,
 4    as well as a $30 processing fee if you pled guilty or were
 5    convicted of that charge.
 6              Do you understand, sir, what you're charged with?
 7              THE DEFENDANT:  Yes, sir.
 8              THE COURT:  Do you understand the penalties, the
 9    maximum penalties for that charge upon conviction?
10              THE DEFENDANT:  Yes, Your Honor.
11              THE COURT:  Mr. Childers, you were present when I
12    reviewed with everyone their constitutional rights here
13    today.  Did you understand what I told you?
14              THE DEFENDANT:  Absolutely, yes, sir.
15              THE COURT:  Do you have any questions about those
16    rights?
17              THE DEFENDANT:  No, sir.
18              THE COURT:  And to reflect the fact that you
19    understand your rights, did you read over, understand, and
20    sign this acknowledgement of rights form I'm holding up?
21              THE DEFENDANT:  Yes, sir.
22              THE COURT:  And, Mr. Roberts, did you sign this
23    form and review it with your client?
24              MR. ROBERTS:  I did.
25              THE COURT:  And when you did so did he appear to
```

1    understand it?

2          MR. ROBERTS:  I believe so, yes, sir.

3          THE COURT:  Very good.  Secondly, I have another

4    form, Mr. Childers, that appears to be signed by you in

5    three places.  It is a consent and waiver form I'm holding

6    up.  I guess we don't need to go through this because it's

7    not a class A misdemeanor.

8          MS. STERLING:  That's correct.

9          THE COURT:  So there is no need to address the

10   consent.  I was going to ball out Mr. Roberts for not

11   signing this form, but it's not necessary for this

12   particular instance.

13         MR. ROBERTS:  As long as you ball me out and not

14   him, Judge, that's fine.

15         THE COURT:  All right.  Gentlemen, Mr. Childers, is

16   it correct that you desire to plead not guilty and to go to

17   trial on this charge?

18         THE DEFENDANT:  Yes, that is correct, yes, sir.

19         THE COURT:  Very well.  Then if you will both be

20   seated, we will proceed with the presentation of evidence

21   unless either attorney desires to make an opening statement.

22         MS. STERLING:  No opening statement is necessary.

23         MR. ROBERTS:  Defense waives opening statement,

24   Your Honor.

25         THE COURT:  All right.  Thank you, both.  Is there

1    any request to have witnesses excused from the courtroom

2    during the taking of testimony other than the testifying

3    witness?

4              MR. ROBERTS:  I would so move, if it please the

5    Court, and we have one witness, Mr. Hodge, who should be

6    excused as well.

7              THE COURT:  Very well.  Then who is your first

8    witness, Ms. Sterling?

9              MS. STERLING:  Officer Howlett.

10             THE COURT:  All right.  Anyone other than that

11   officer who expects to testify should wait outside the

12   courtroom.  You will be notified when it's your turn to

13   testify.

14             (Witness was sworn.)

15             ZACHARY R. HOWLETT, called by the Government,

16   having been first duly sworn, was examined and testified as

17   follows:

18                       DIRECT EXAMINATION

19   BY MS. STERLING:

20   Q.  If you would, sir, please state your full name for the

21   Court.

22   A.  Zachary Robert Howlett.

23   Q.  And, Mr. Howlett, how are you employed?

24   A.  I'm employed through the Virginia Department of Game and

25   Inland Fisheries.

1    Q.  And what is your title and position?

2    A.  Conservation police officer.

3    Q.  And what does that entail?

4    A.  It entails hunting, trapping, fishing laws, as well as

5    boating laws.

6    Q.  And you are charged with enforcing those laws?

7    A.  Yes, ma'am.

8    Q.  And how long have you been in that position?

9    A.  Since September of 2016.

10   Q.  Okay.  Were you so employed in December of 2018 and

11   January of this year 2019?

12   A.  Yes, ma'am.

13   Q.  Okay.  In December of 2018 did you become involved in an

14   investigation of a purported baiting in the area of the

15   Gordon's Creek off Chickahominy River and James City County,

16   Virginia?

17   A.  Yes, ma'am.

18          THE COURT:  Which creek, I'm sorry?  Did you say

19   Gordon's Creek?

20          MS. STERLING:  The Gordon's Creek, I'm sorry, Your

21   Honor.  Gordon's Creek.

22          THE COURT:  Thank you.

23          THE WITNESS:  Yes.

24   BY MS. STERLING:

25   Q.  And if you for the Court just --

1          MR. ROBERTS:  Pardon me, Judge.  If it please the

2     Court, my research indicates that it's Gordon Creek.  It is

3     often called Gordon's Creek.  But, for the record, I think

4     it's Gordon Creek.

5          MS. STERLING:  Gordon without the S; is that

6     correct?

7          MR. ROBERTS:  Either way.

8          THE WITNESS:  Either way, yes.

9     BY MS. STERLING:

10    Q.  Okay.  Is it called Gordon without the S?

11    A.  I believe so, yes.

12    Q.  Okay.  All right.  Thank you for that.  And that's off of

13    Chickahominy River; is that correct?

14    A.  Yes, ma'am.

15    Q.  And James City County?

16    A.  Yes, ma'am.

17    Q.  And where, approximately, is that?

18    A.  It would be just south of Jolly Pond and Centerville Road

19    are the closest roads in the Williamsburg area near Ford's

20    Colony.

21    Q.  Okay.  In the Williamsburg area.  Okay.  And that area is

22    in the Eastern District of Virginia; is that correct?

23    A.  Correct.

24    Q.  Okay.  And how did you become involved in this

25    investigation and when did your involvement occur?

Howlett, Z. - Direct                                              11

1  A.  I was informed December 22nd, 2018 by another CPO Charles
2  Leftwich --
3  Q.  Is that a conservation police officer?
4  A.  Yes, ma'am.
5  Q.  Yeah.  Okay.  Thank you.  Go ahead.
6  A.  He informed me about a baited site at the very back end
7  of Gordon Creek.
8          MR. ROBERTS:  Well, Judge, I think baited site
9  calls for a conclusion.  If the officer can just tell us
10 what the other officer saw, I'm not going to object to the
11 hearsay, but baited implies an intent without more
12 information.  Do you agree?
13         MS. STERLING:  That's fine.
14 BY MS. STERLING:
15 Q.  If you could tell us what he said in terms of what he
16 observed.
17 A.  He had said that he had saw corn and Milo at the back of
18 the creek.
19 Q.  And that's Gordon Creek?
20 A.  Yes, ma'am.
21 Q.  And where is the back of the creek?  Where,
22 approximately, is that?
23 A.  It would be at the very end of West Port Road, which is a
24 subdivision off of Ford's Colony off of Centerville Road.  He
25 was able to provide me with GPS locations off of his phone

1   from where he initially saw it.

2   Q.  Okay.  And is Westport a residential area?

3   A.  It is.

4   Q.  And Ford's Colony also a residential area in

5   Williamsburg?

6   A.  It is.

7   Q.  Okay.  Based on that information, what did you do?

8   A.  I was able to locate -- the best entrance in through West

9   Port Road, was able to walk down through an access road that

10  wasn't gated and was able to walk right down to the marsh

11  where the GPS location was.  With that spot I was able to

12  find the corn and the Milo that was described to me.

13  Q.  And what exactly did you see on December 20, what was it,

14  the 23rd --

15  A.  23rd is when I officially went down.

16  Q.  And you -- the location you went to was the location, the

17  GPS location that you had gotten from the other officer,

18  correct?

19  A.  Correct.

20  Q.  So tell us specifically what you observed.

21  A.  From there all I did was walk onto the marsh.  As soon as

22  I walked onto the marsh, I was able to see corn and Milo both

23  floating and on the bottom of the -- on the surface water --

24  basically on the bottom of the little creek bed there when

25  the tide was out.

Howlett, Z. - Direct                                                    13

1   Q.  Okay.  So was the area, was it in the water or --

2   A.  It was a tidal area, so it would be -- it was a low tide

3   when I walked out.  But depending on the tide, it would have

4   been somewhat underwater but it was essentially a marsh.

5   Q.  Okay.  And what kind -- what was the quantity of corn and

6   Milo that you observed?

7   A.  I'm going to say a noticeable amount to where you could

8   see it as far as you -- you know, as soon as you walked out,

9   I was able to see it.  I don't know as far as quantity, if

10  you're looking for an amount or --

11  Q.  Could you -- no.  No.  It was clearly visible as you

12  approached?

13  A.  Correct.  As soon as I stepped onto the marsh, I could

14  see.

15  Q.  Was it something you needed to search for or was it --

16  A.  I could look down and see it right at my feet.  I mean...

17  Q.  Okay.  And so how far out in the marsh did it go, if you

18  know that?

19  A.  At the low tide I would probably say at least 10 feet out

20  from where the marsh started out to the creek channel, 10

21  feet from there.

22  Q.  Okay.  And what's the significance of finding corn and

23  Milo in the water?

24  A.  Unless -- at that area, very rare.

25  Q.  And, okay, and what does that mean?

1    A.  There is no agricultural fields anywhere in that area.

2    There is nothing in that vicinity that has corn or Milo in

3    that area.

4    Q.  Okay.  In your experience, what, if you have any, as a

5    reason you would find corn and Milo in a marsh and creek

6    area?

7    A.  It would be to bait ducks.

8    Q.  And by baiting you mean what?

9    A.  By placing grain or any type of any other attractant that

10   would attract migratory water fowl.

11   Q.  And how is that that -- how are they attracted to that,

12   corn -- both corn and Milo, correct?

13   A.  It's a source of feed for them.  So they would be able to

14   see -- see the corn from the air.  It would attract them in

15   to feed there, and they would stay there as long as any type

16   of food source was present till it was gone.

17   Q.  Okay.  When you went down on this occasion, did you see

18   migratory game birds in the area?

19   A.  Yes, ma'am.

20   Q.  And about how many or what was their pattern, anything

21   unusual?

22   A.  Every time I was down there, several dozen ducks would

23   get up as I walked onto the marsh, as well as geese were

24   present as well.

25   Q.  What were they getting up from?

Howlett, Z. - Direct                                              15

```
1   A.  The immediate area from where the corn and Milo was.

2   Q.  All right.  And had you been in that area before?

3   A.  Prior to the 23rd, no.

4   Q.  Okay.  And when you approach a marsh and creek area, is

5   it unusual to see that many ducks in the area?

6   A.  Congregated in that concentration in that small area,

7   yes.

8   Q.  Okay.  When you say in that small of an area, how small

9   of an area was it?

10  A.  I would say roughly -- roughly 75 yards long.

11  Q.  And so were they all -- were the group of ducks all

12  together?

13  A.  Correct.

14  Q.  And the geese were all together?

15  A.  Correct.

16  Q.  Is that, in your experience, unusual?

17  A.  Not unusual as see them together, but, like I said, in

18  that concentration where you've got several dozen, especially

19  in that area, yes, it's unusual.

20  Q.  And when you say it's unusual, what would you normally

21  expect to see?

22  A.  I would say less than a dozen here and there, not, you

23  know, concentrated in that dense of amount.

24  Q.  And you say that based on your experience as a

25  conservation officer?
```

1    A.  My experience as a conservation officer and my experience

2    in hunting, I've never seen that dense of amount in the

3    certain area over that prolonged period of time.

4    Q.  And how long have you been in migratory -- you're a bird

5    hunter, migratory game bird hunter?

6    A.  Correct.

7    Q.  And how long have you been a hunter?

8    A.  Since I was 12 years old.

9    Q.  And are you from the Williamsburg area?

10   A.  I have lived in Williamsburg since 2001.

11   Q.  So have you been hunting in that area?

12   A.  Correct.

13   Q.  Okay.  I want to show you what's been marked as

14   Government's Exhibit Number A.

15        I'm going to show this to him, Your Honor, and then

16   I'm going to put it on the overhead so it's visible to the

17   Court, as well.

18        I'm going to give you a pen.  I -- this -- let me

19   have you identify it first.  Could you tell me what that is?

20   A.  This is a map of the immediate area where the hunters

21   were located the day that we observed any activity that shows

22   the location of the hunters and as well as the property

23   boundaries in the immediate area where Gordon's Creek is.

24   Q.  Okay.  So just for the record, to give the Court a better

25   background, your original investigation, you went out there

1    on December 23rd, but when is the date when -- when you came

2    in contact with Mr. Childers?

3    A.   The January 19th, 2019.

4    Q.   And it was in the Gordon Creek area which you

5    investigated on December 23rd; is that correct?

6    A.   Correct.

7    Q.   And that is a map of the Gordon Creek area which you

8    investigated on the 23rd and in which you contacted

9    Mr. Childers on the 19th of January; is that correct?

10   A.   Correct.

11   Q.   And on that map, if you could, clearly mark the area

12   where you saw Mr. Childers on the 19th of January.

13   A.   (Witness complied.)  It's going to be a little hard to

14   see the red, but it's where the green dot is.

15   Q.   Okay.  There was a previous mark on it that was a small

16   circle, correct?

17   A.   Right.

18          THE COURT:  You show it to defense counsel.

19          MR. ROBERTS:  It's been shared with me in

20   discovery, Judge, and we are going to try and use the

21   overhead.  I don't object subject to brief voir dire in

22   regard to the map, if I may.

23          MS. STERLING:  I would move to admit this map, Your

24   Honor.  I wanted to leave it up for -- as a reference point.

25   The mark that the officer made, it's a circle around a

Howlett, Z. - Direct                                          18

```
 1   little green dot.
 2           THE COURT:  I see that.
 3           MS. STERLING:  Can you see that, Your Honor?
 4           THE COURT:  So just to the -- underneath the
 5   Westport Neighborhood Association, Inc.?
 6           MS. STERLING:  Yes, Your Honor.  Yes, Your Honor.
 7           THE COURT:  And the body of water that dot is
 8   adjacent to, is that Gordon Creek?
 9           MS. STERLING:  It is, Your Honor.  And, again,
10   thank you.  We move to admit that as Government's Exhibit
11   Number 1, and we are going to leave it up for reference
12   purposes.
13           MR. ROBERTS:  Subject to voir dire of the witness,
14   I don't object to it.
15           MS. STERLING:  Okay.
16           THE COURT:  I'll reserve ruling --
17           MS. STERLING:  Okay.  Thank you.
18           THE COURT:  -- pending that voir dire.
19   BY MS. STERLING:
20   Q.  All right.  And so when you went out there on the 23rd of
21   December, you indicated you saw both corn and Milo, correct?
22   A.  Correct.
23   Q.  Let me show you what's been previously marked as
24   Government's Exhibit Number 2 and ask you to identify this
25   photograph.
```

Howlett, Z. - Direct                                      19

1            MR. ROBERTS:  I've been provided this in discovery,

2    Judge.

3            MS. STERLING:  Right.

4            MR. ROBERTS:  Again, subject to voir dire.

5    BY MS. STERLING:

6    Q.  If you would identify it.

7    A.  This is the corn that I was able to find on the 23rd of

8    December on my first trip back into the marsh.

9            MS. STERLING:  Okay.  Thank you.  I would move to

10   admit what's been marked as Government's Exhibit Number 2,

11   Your Honor.

12           THE COURT:  I will reserve on that pending defense

13   counsel's questioning of Government's Exhibit 2.

14   BY MS. STERLING:

15   Q.  All right.  Now, you said you saw the corn and Milo in

16   the area -- on the 23rd.  We are still on the 23rd?

17   A.  Correct.

18   Q.  Are those two grains commonly used to attract -- attract

19   ducks for hunters?

20   A.  Correct.

21   Q.  And is that known to hunters and law enforcement officers

22   involved in the protection of migratory game birds?

23   A.  Yes, ma'am.

24           MR. ROBERTS:  Well, I object to what hunters know,

25   Judge.

 1  BY MS. STERLING:

 2  Q.  Is that done to you as a hunter?

 3  A.  Yes, ma'am.

 4          MR. ROBERTS:  I'm sorry.

 5          MS. STERLING:  I'm sorry.  I meant for him

 6  personally.

 7  BY MS. STERLING:

 8  Q.  Okay.  All right.  Now, what did you do after your

 9  observations on December 23rd?

10  A.  After December 23rd, the corn models, photographed the

11  event, set up cameras at the entrance to Westport going back

12  into the lot that I used to access.  I'll get you the exact

13  date here.  Well, we had placed two trail cameras set on the

14  26th of December.  One was facing the entrance to Westport

15  into that lot where there was a little parking area that

16  was -- looked like it had been recently used, and we also set

17  a camera up overlooking the marsh, would be just to the left

18  of the green dot on the map if you were looking at the map.

19  Q.  So from my -- if you could please describe the Westport

20  area.  It's a residential area?

21  A.  It is a residential area.  There is not very many homes

22  in there.  When the investigation was going on, there's a few

23  rentals in there.  The back cul-de-sac that you can see on

24  the map, there was only, I believe, one house being currently

25  built back there at the time.  And then this was a vacant lot

Howlett, Z. - Direct                                                    21

```
 1   at the time.
 2   Q.  When you say "this was a vacant lot," the lot which you
 3   traversed in order to get to the marsh --
 4   A.  Correct.
 5   Q.  -- that you observed is a vacant lot?
 6        Okay.  So who owns that property, the lot near the
 7   properties within the Westport -- can I call it -- is it a
 8   housing development?
 9   A.  Correct.
10   Q.  There is an actual development?  Okay.
11   A.  At the time it was Marine Land Holdings.  I know since
12   then it has changed ownership to the Westport Neighborhood
13   Association, but at the time it was under Marine Land
14   Holdings.
15   Q.  So the lot that you crossed to get to the marsh, was that
16   owned by Meridian?
17   A.  Yes, ma'am.
18   Q.  Okay.  And would the -- was there public access to the
19   Westport development?
20   A.  It's off of Centerville Road, which is a public road.  To
21   get into Westport in the neighborhood there is a no
22   trespassing video surveillance sign posted at -- on the
23   entrance road going into Westport.
24   Q.  Is there a gate or is it just --
25   A.  There is no gate.
```

1    Q.   Okay.  All right.  But the sign is clearly posted?

2    A.   It is clearly posted in the median.

3    Q.   Okay.  And were there any other signs posted?

4    A.   Not back on the lot at all.

5    Q.   Okay.  So but there isn't anything within Westport other

6    than lots and homes on which -- lots on which homes have been

7    built in and empty lots; is that --

8    A.   Correct.

9    Q.   Okay.  Was there anything going on in there at the time

10   that you recall, any type of --

11   A.   On the actual lots --

12   Q.   Well, in Westport in general?

13   A.   Just construction for home building.

14   Q.   Okay.  So we've heard this today on this camera, one was

15   at the entrance to the neighborhood, correct?

16   A.   At the entrance to the West -- the lot that we were using

17   to access --

18   Q.   Oh, okay.

19   A.   -- swamp, not at the entrance --

20   Q.   Okay.

21   A.   The entrance to Westport has its own security cameras.

22   Q.   All right.  So there is a security camera there and you

23   put up one at the entrance to the lot and then one down by

24   the marsh, correct?

25   A.   Yes, ma'am.

Howlett, Z. - Direct                                            23

```
 1   Q.  Okay.  And what was the purpose of those surveillance
 2   cameras?  Why were you engaged in putting those up?
 3   A.  At the time we weren't sure they were coming in and
 4   through -- to access through the lot or if they were coming
 5   in by boat.  So we had the one camera overlooking the creek
 6   channel, if they were going to come in by boat, or you had
 7   the other camera set up at the entrance to the lot because
 8   you could see tire tracks up and down the parking area on the
 9   vacant lot because we didn't know if they were coming in that
10   way, so we --
11   Q.  You said were tire tracks from the roadway, the
12   cul-de-sac down to the waterway?
13   A.  Correct.
14   Q.  Okay.  And when you say "they" --
15   A.  We didn't know who, we just --
16   Q.  You don't know who, just people -- someone was coming
17   down in a vehicle?
18   A.  Correct.
19   Q.  Okay.  So you put those surveillance cameras up to see
20   who, if anyone, was coming down?
21   A.  Correct.
22   Q.  And how long were the cameras up?
23   A.  My camera, I believe, was up -- which my camera was the
24   one at the entrance to the lot, was up for about a week and a
25   half.  The camera overlooking the marsh, I believe, was up
```

1   for several weeks.

2   Q.   Okay.  And did you subsequently review surveillance film

3   from those cameras?

4   A.   I did.  The cameras from the ones that we had set up and

5   the cameras at the entrance -- that Ford's Colony with

6   Westport had at their entrance as well.

7   Q.   So you looked from the entrance to Westport and then from

8   the entrance to the lot area?

9   A.   Correct.

10  Q.   You reviewed both of those?

11  A.   Correct.

12  Q.   And what about down by the marsh, did you review those?

13  A.   Correct.

14  Q.   And what, if anything, did you see on those cameras?

15  A.   We were able to see, on the 27th of December, as well as

16  the 26th, two different vehicles pull into the lot at

17  Westport there where my camera was set up, and on the 27th we

18  were able to see Mr. Childers and his son walking down

19  towards the creek.  I believe they were down there for

20  approximately 20 minutes before they returned back to the

21  vehicle and left.

22  Q.   So did the camera reveal that they parked on the lot or

23  adjacent to the lot?

24  A.   They had parked on the lot.  My camera was facing down

25  towards the swamp, so they would have been driving onto the

1   lot and parked on the lot and walked down to the swamp.

2   Q.   And, again, this was the lot that Meridian Land Holdings

3   owned it?

4   A.   Correct.

5   Q.   Okay.  And so you saw -- how were you able to identify

6   them?

7   A.   We were able to get a license plate off of the vehicle

8   driven, and through the pictures, it's pretty clear that

9   later on --

10  Q.   And when you say Mr. Childers, you mean Mr. Larry

11  Childers?

12  A.   Yes.

13  Q.   And did you know Mr. Childers prior to this date?

14  A.   No, ma'am.

15  Q.   Do you see him here today?

16  A.   Yes, ma'am.

17  Q.   Could you point him out for us.

18  A.   Down there to my right.

19          THE COURT:  For the record, he has identified the

20  defendant, Larry Childers.

21          MS. STERLING:  All right.  Thank you.

22  BY MS. STERLING:

23  Q.   So you saw Mr. Childers and his son -- how far down into

24  the lot did the vehicle go?

25  A.   From the entrance of the cul-de-sac from the lot probably

1    150 feet.

2    Q.  And did the surveillance camera reveal that they exited

3    the vehicle?

4    A.  Correct.

5    Q.  And walked down?

6    A.  Correct.

7    Q.  Okay.  And were you able to see what they were doing?

8    A.  Oh, yeah.

9    Q.  And I believe you testified the approximate time that

10   they were out of the vehicle was 20 minutes; is that correct?

11   A.  Correct.

12   Q.  And then what happened?

13   A.  We were able to -- like I said, they -- we were able to

14   get them on camera at 9:58 a.m. that morning of the 27th.

15   And they were in there on the 27th after 10:00 p.m. -- or

16   after 10:00 a.m., I'm sorry, from the Westport camera.

17   That's when, I believe, shortly after that I was able to,

18   like I said, to obtain that after pulling my camera from

19   there.  We left the one, the camera in the marsh was set up

20   still, but I had pulled my camera from the entrance shortly

21   after that.

22   Q.  And I believe you said there was also another individual

23   on the camera?

24   A.  There was.  That individual was seen on the 26th,

25   actually --

1          MR. ROBERTS:  Well, I'm going to object to the

2     relevance of that, Judge.  I mean, we are talking about an

3     event on the 19th of January.  He's laying the foundation as

4     to why he went there on that day.  I don't know whether --

5          MS. STERLING:  I'll move on with that, Your Honor.

6     BY MS. STERLING:

7     Q.  Did you see anybody else other than Mr. Childers and this

8     other individual?

9     A.  No.

10    Q.  Okay.  And that was for a week to ten days?

11    A.  From the 23rd till the day I made contact with

12    Mr. Childers on the 19th.

13    Q.  About how long was the surveillance -- the surveillance

14    cameras weren't up that whole time, were they?

15    A.  They probably -- the longest was the one on the marsh

16    which would have been from -- when was it -- the 26th, that

17    was probably up till sometime around the new year --

18    Q.  Okay.

19    A.  -- before it came down.

20    Q.  All right.  Based on your knowledge and information,

21    would there be any reason for someone to be on that lot?

22    A.  Not to my knowledge, no.

23    Q.  Okay.  And is this -- the area where the lot is and down

24    to the marsh, is this an area where migratory game bird

25    hunting normally occurs?

1    A.  That far -- on the creek, yes, but that far back, in

2    my -- you know, personally, no, I haven't seen anybody hunt

3    back in there.

4    Q.  On Gordon -- how long is Gordon Creek?  Is it a --

5    A.  It's several miles long.

6    Q.  Are there areas in Gordon Creek where migratory game bird

7    hunting regularly occurs?

8    A.  There is.

9    Q.  And where and what type of areas are these?

10   A.  It's mostly done from stationary blinds that are owned

11   either through private parties or through hunt clubs, but

12   they are all farther out towards the mouth of the creek.

13   Q.  And are there many of those?

14   A.  I would say there's -- there's several, yes.

15   Q.  Okay.  Is it normally the case that hunters like to hunt

16   from blinds, in your experience?

17   A.  Yes, either from a stationary blind or a floating blind.

18   Q.  Okay.  And you didn't see any blind in this area of

19   Gordon Creek where you were examining and finding the Milo

20   and the corn, correct?

21   A.  No, ma'am.

22   Q.  Okay.  All right.  Okay.  So you said that you came back

23   to this area a second time, another time -- after the 23rd

24   you came back again.  What date was that?

25   A.  After the 23rd, I was back on the 26th at 7:24 in the

1   morning.  I sat down there for a short brief time.  Didn't

2   observe any shots that day or that morning.  While returning

3   back on the 26th at 1523 where we placed the cameras up,

4   didn't return back -- another Officer Joyce was in that area

5   on the 9th of January, and then I didn't return back until

6   the 18th of January.

7   Q.  Okay.  And so what happened on the 18th?  What did you do

8   on that date?

9   A.  18th of January I walked down to the marsh again, and I

10  could see that it was -- there was a heavy amount of Milo at

11  the same area that I had seen the corn and the Milo.  It

12  looked like it had been replenished or restocked in that same

13  area.

14  Q.  Did you see corn, as well, or -- well, was there anything

15  different about the way that it looked and what you observed

16  on the --

17  A.  There was still some corn present but it was mainly Milo

18  on the 18th when I was in there.

19  Q.  And why do you say you think it was -- it looked like it

20  had been replenished?

21  A.  Every time on the 18th when I went back, there was a lot

22  more in that area than what I'd originally seen on the

23  23rd --

24  Q.  Okay.

25  A.  -- and on the 26th.

1  Q.  Well, when you were there, did you see a lot of -- did
2  you see birds on the 26th?
3  A.  Every time I was in there, I saw birds.
4  Q.  And what were they doing and how many of them were --
5  A.  Every time I walked down to the marsh, several dozen
6  ducks would jump up, would flush out of the area, as well as
7  geese.
8  Q.  So that happened on the 23rd, the 26th and --
9  A.  And January 18th.
10  Q.  -- January 18th?  Was it about the same number of birds,
11  the same type of activity?
12  A.  Same type of activity, yes.
13  Q.  Do you know about the same number of birds?
14  A.  I would say the same number of birds.  The morning of the
15  19th I was able to still observe birds flush out of the area
16  right at daylight -- well, right before daylight.
17  Q.  And is that unusual?
18  A.  Um, on the 19th I would say that the birds flushed out
19  when the boat came in to the creek there.  There was several
20  dozen geese that got up that morning and several dozen --
21  Q.  So are we talking about the 18th -- let's talk about the
22  18th.
23  A.  The 18th.
24  Q.  We are going to talk about the 18th.
25  A.  The 18th, like I said, several dozen geese, several dozen

1    bigger ducks.
2    Q.  And did you take photographs of the area also on the
3    18th?
4    A.  I did.
5    Q.  Let me show you what's been previously marked as
6    Government's Exhibit Number 3.
7            MR. ROBERTS:  Same objection, subject to voir dire.
8    BY MS. STERLING:
9    Q.  Can you identify that photograph, please?
10   A.  This is a photo I took on the 18th of January.  It's a
11   log underneath the water's surface, and on top of that log is
12   Milo.
13   Q.  All right.  That similar to what --
14           MR. ROBERTS:  Is that Government's Exhibit 3?
15           MS. STERLING:  It is, Your Honor.  Thank you.  We
16   would move to introduce what's been marked as Exhibit Number
17   3, Government's Exhibit Number 3.
18           THE COURT:  I'll reserve pending cross-examination.
19           MS. STERLING:  Okay.  Thank you, Your Honor.
20   BY MS. STERLING:
21   Q.  And so you returned after the -- you took these
22   photographs, you didn't see anyone out there on the 18th?
23   A.  Correct.
24   Q.  And when did you return next?
25   A.  I returned back the next morning on the 19th.  I had

1   Officer Joyce drop me off at the vacant lot probably around

2   5:45 that morning.

3   Q.   Okay.  Prior to sunrise?

4   A.   Yes, ma'am.

5   Q.   And so what did you do when you arrived there?

6   A.   I was able to position myself on the north -- on the

7   woodbine overlooking where I saw the baited area.

8   Q.   Okay.  Were you able to see -- did you see birds when you

9   arrived?

10  A.   When I arrived, it was dark, so I couldn't see any.

11  However, like I said, when the boat came in, my understanding

12  by boat, several dozen geese, several dozen ducks all flushed

13  out of the area.

14  Q.   Okay.  So tell us everything that you observed when you

15  arrived.  You went down to a knoll and you were watching the

16  area.  Did you see anyone there?

17  A.   There was nobody there at the time that I got there.  At

18  approximately 6:37 in the morning, a jon boat with a mud

19  motor was coming up the creek.  The operator dropped two

20  hunters off of the shoreline directly in front of me.

21          The operator of the boat made his way a short

22  distance up the creek from where the two hunters were dropped

23  off.  You could hear them essentially -- look at the -- on

24  the shoreline, and the operator of the boat walked over

25  towards where the original two hunters were dropped off.

Howlett, Z. - Direct                                                    33

1  Q.  So there were a total of three hunters?

2  A.  Yes, ma'am.

3  Q.  Okay.  And then what did you observe beyond that?

4  A.  After he dropped the three hunters off, I noted the first

5  shot at 6:56 that morning, and the second shot at 7:14 that

6  morning.  I didn't make contact with the hunters until 8:10

7  that morning.  In that time that he had dropped -- whomever

8  was dropped off and on the shoreline, there was no duck calls

9  or goose calls being made at all.  No decoys were placed out

10  at all either.

11  Q.  And is that unusual?

12  A.  In my experience, yes.  To not have decoys out, I've

13  always hunted with decoys.

14  Q.  And in your capacity as a law enforcement officer, is it

15  unusual to see people, duck hunters hunting without decoys or

16  duck calls?

17  A.  This would be the first time that I have ever checked

18  anybody that hasn't had decoys out.

19  Q.  Okay.  And you indicated, I believe, that when the boat

20  came up, that that flushed out the ducks and geese causing

21  them to get off -- fly up off the ground, correct?

22  A.  Correct.

23  Q.  And that was, again -- I believe you indicated that kind

24  of the same number, a couple dozen?

25  A.  Correct.

1   Q.  And that unusual -- okay.  So you heard the two shots.

2   Did you hear any more shots?

3   A.  I only heard the two shots.

4   Q.  And -- all right.  You said that at 8:10 you made contact

5   with the hunters.  Tell us about that, if you would, please.

6   A.  All the hunters, they were standing on the shoreline in

7   the marsh.  I first made contact with James Childers on -- he

8   was up off of the marsh.  He had come up, I believe, to use

9   the restroom, but I'd made contact with him before he was to

10  use the restroom.

11          At that time asked him to call the other two hunters

12  that were back on the marsh back so that I could do a

13  compliance check for hunting licenses as well as safety

14  equipment inspection on the vessel.

15  Q.  And in the course of your investigation did you determine

16  the relationship between James Childers and Mr. Larry

17  Childers?

18  A.  During license check.

19  Q.  What's Mr. James Childers' relation to Larry Childers?

20  A.  It's his father.

21  Q.  Which is it?  Larry is the father?

22  A.  Larry is the father, yes.

23  Q.  Okay.  And how old is James Childers?

24  A.  I believe at the time he was 17.

25  Q.  So he was a juvenile, correct?

1  A.  Yes, ma'am.

2  Q.  Okay.  And the third person, who was that?

3  A.  The third person was a Brandon Hodge, I believe, his last

4  name is pronounced.  He was a friend of James Childers.

5  Q.  Okay.  Was he at -- do you know how old he was?

6  A.  He had just turned 18.

7  Q.  Okay.  All right.  Go ahead.  So you came in contact with

8  Mr. Childers and then the others and you did a compliance

9  check, correct?

10  A.  Correct.

11  Q.  And that did involve getting their identifying

12  information, correct?

13  A.  Correct.

14  Q.  And then what else did you do?

15  A.  We were able -- after we did a compliance check with

16  licenses, Mr. Childers and myself and Officer Joyce walked

17  over to where the boat was parked at.  We did a safety

18  compliance check.  While doing the safety compliance check,

19  while Mr. Childers was on the boat, I could look down and

20  standing right next to the boat and see Milo at the base of

21  the boat in the water right at my feet.

22        After a safety compliance check, everything was fine

23  with that, I called all the hunters back over to the group,

24  and that is when I informed them that they were hunting over

25  the baited area.

Howlett, Z. - Direct                                                    36

1    Q.   Okay.  You informed the three of them together?

2    A.   Correct.

3    Q.   And did you have any specific conversations with

4    Mr. Larry Childers?

5    A.   When we first made contact, I had asked Mr. Childers if

6    they had shot anything that morning.  Mr. Childers had stated

7    that they had shot two birds.  When I asked who shot them,

8    they said that the boys both shot the first one, meaning I

9    guess they shot the same exact time, and that he had shot the

10   second one.

11          I asked about the spot that they were hunting, about

12   how often they hunt the area.  Mr. Childers said that they've

13   hunted it before and that they walked from a private ramp.

14   Then after the compliance check, I informed all of them that

15   I knew about the bait in the creek.  Mr. Childers kind of

16   gave a flabbergasted look on his face after I made that

17   comment.  Mr. Childers also stated that the individual that

18   put the bait out was not hunting with them.  I questioned

19   Mr. Childers about the name of the individual that placed the

20   bait but did not want to give any names to me.

21          Mr. Childers made the acknowledgement that he knew

22   the bait was there, but also commented that since he did not

23   put the bait out, that they were good to hunt the area.  At

24   that time I informed Mr. Childers that it was still a baited

25   area, asked the boys if they knew it was a hunting -- if it

1    was baited.  Mr. Childers replied for them and stated no,

2    they didn't.

3    Q.  Mr. Larry Childers replied?

4    A.  Yes.

5    Q.  And so did you -- did you look at the birds that had been

6    shot?

7    A.  The two birds that were shot were two drake mallards.

8    Q.  And those are migratory game birds within the meaning of

9    the migratory bird --

10   A.  Yes.

11          MR. ROBERTS:  We will stipulate they were game

12   birds, they were migratory, they were mallards, and that

13   there is no issue with the chain of custody, Your Honor.

14          MS. STERLING:  Thank you.

15          THE COURT:  Thank you.

16   BY MS. STERLING:

17   Q.  All right.  And did you ask him any specific questions

18   about when he said -- he -- he -- about you said he knew that

19   the area had been baited; is that correct?

20   A.  Correct.

21   Q.  And did he indicate when he knew that to have occurred or

22   if he knew?

23   A.  He had stated that it was sometime during the -- it would

24   have been the split, which when duck season is out.

25   Q.  And what exactly does the split mean?

1    A.   When duck season goes out, we just -- we call it a split

2    to where you have the first split during early duck season,

3    second split, and the third split.  So this would have been

4    just before.

5    Q.   So when duck season starts, the split means there is a

6    period of time when you can't hunt and then the second phase

7    begins; is that correct?

8    A.   Correct.

9    Q.   Do you happen to know when that time was?

10   A.   I believe it was sometime during the December 2nd through

11   the end of December 19th of that year.

12   Q.   And that -- in December of 2018?

13   A.   Correct.

14   Q.   Okay.  All right.  And -- okay.  The -- did you speak

15   with Mr. Childers about the property, the lot?

16   A.   I did.  I asked Mr. Childers if he had permission, since

17   we were standing on the shoreline --

18          MR. ROBERTS:  I'm going to object to the relevance,

19   Judge.  He's only charged with hunting over bait, not

20   trespassing or --

21          THE COURT:  What's the relevance?

22          MS. STERLING:  Your Honor, it just goes to the

23   total picture of what is going on here and how he is there

24   and why he is there.  And I was just indicating that there

25   was -- it was not a public place, and it was not a place

 1    where he could have otherwise accessed the creek.

 2            THE COURT:  I'll overrule the objection for what

 3    it's worth.  I do note he's not charged with trespassing or

 4    there is no foundation.

 5            MS. STERLING:  That's correct, Your Honor.

 6            THE COURT:  You may finish answering your question,

 7    Mr. Howlett.

 8            THE WITNESS:  Finish answering the -- he just

 9    stated that they had permission when there was -- he said it

10    was a gentleman named Tommy, and the adjacent landowner in

11    that area is a Tommy Hitchens, which you can see on the map

12    where Thomas Hitchens has his property lines.  I did speak

13    with Mr. Hitchens --

14            MR. ROBERTS:  Well --

15    BY MS. STERLING:

16    Q.  Were you able to determine whether that was Mr. Hitchens'

17    property?

18    A.  It was not.

19    Q.  Thank you.  All right.  I want to show you now what's

20    been marked as Government's Exhibit Number 4 and ask you to

21    identify that for me, please, and tell me the date on which

22    it was taken.

23            MR. ROBERTS:  Same situation with this -- I have

24    been provided subject to voir dire, Judge.

25            THE WITNESS:  This was the area the hunters were

Howlett, Z. - Direct                                             40

1    hunting in just off of the shoreline from coming down off of

2    Westport off the vacant lot.  This is looking back towards

3    the back end of the creek.  The two main trees that you see

4    at the back of the picture would have been the general area

5    where the boat was when we did the compliance check.  This

6    was taken on the 19th, the day of the exam.

7    BY MS. STERLING:

8    Q.  Okay.  And we'd -- that was marked as Government's Number

9    4?

10   A.  4.

11          MS. STERLING:  We would move to introduce this.

12          THE COURT:  All right.  I'll reserve on that

13   pending cross-examination.

14   BY MS. STERLING:

15   Q.  And let me show you what's been marked as Government's

16   Exhibit Number 5 and ask you to identify that, please.

17          MR. ROBERTS:  Again, the government's been kind

18   enough to provide all these photos, Judge.  It's the same

19   situation, if it please the Court.

20          THE WITNESS:  This is just a close-up of the water

21   there.  It's also taken on the 19th that does show Milo

22   underneath the surface of the water.

23          MS. STERLING:  We would move to introduce what's

24   been marked as Government's Exhibit Number 6.

25          THE COURT:  5?

```
 1              MS. STERLING:  I'm sorry, Your Honor, 5.  Thank
 2    you.
 3              THE COURT:  I will reserve on that photo as well.
 4    BY MS. STERLING:
 5    Q.  And let me hand you what's been marked as Government's
 6    Exhibit 6.
 7              MR. ROBERTS:  Oh, this is what we stipulated?
 8              MS. STERLING:  Yes.  Yes.
 9              MR. ROBERTS:  Yes, sir.  That's -- I have no
10    objection.  This is the chain, I believe.
11              THE WITNESS:  This was Milo that was recovered from
12    the marsh area on the day of the 19th.
13              MS. STERLING:  We would move to introduce that,
14    Government's Number 6.
15              THE COURT:  It will be admitted and received into
16    evidence.  The defendant says they stipulate.
17              (The document was received in evidence as
18    Government's Exhibit No. 6.)
19    BY MS. STERLING:
20    Q.  One last one for you, Mr. Howlett.  Government's Exhibit
21    Number 7.
22              MR. ROBERTS:  No objection to this rather ghastly
23    photo, Your Honor.
24              THE WITNESS:  Two drake mallards that were seized.
25              MS. STERLING:  We would move to introduce that
```

Howlett, Z. - Cross                                                42

```
 1  exhibit as well.
 2          THE COURT:  Government's Exhibit 7 will be received
 3  into evidence.
 4          (The document was received in evidence as
 5  Government's Exhibit No. 7.)
 6  BY MS. STERLING:
 7  Q.  And, Officer Howlett, based upon your investigation on
 8  the 19th, what did you do?
 9  A.  At the time, after speaking with all them, one gentleman
10  had a violation for a state hunting license, but I informed
11  all the hunters that I would be getting back in touch with
12  them after speaking with U.S. Fish & Wildlife on the baiting
13  charges.
14          MS. STERLING:  Okay.  All right.  Thank you.
15          THE COURT:  Cross-examination, Mr. Roberts.
16          MR. ROBERTS:  Thank you, Your Honor.
17                      CROSS-EXAMINATION
18  BY MR. ROBERTS:
19  Q.  Officer Howlett, good morning.  I'm going to ask you a
20  series of questions that deal with three basic topics.  The
21  first I'm going to hopefully work with you on this map that
22  the Court has -- and that everyone has on the screen.
23          The second I'd like to question you about duck
24  hunting, your experience with duck hunting, and some of the
25  statements you've made under oath about duck hunting.
```

1            Now I'd like to talk to you more about what happened

2    from the 23rd of December of 2018 until the 19th of January

3    of this year.  All right.  I'll refer you first to the area

4    of Gordon Creek.  Your map stops on the lower left-hand

5    corner and indicates the last property -- can you see my

6    finger there?

7    A.  Yes, sir.

8    Q.  -- Wright, James M., trustee, and Debra S. Trustee,

9    correct?

10   A.  Correct.

11   Q.  Now, in case the Court is not familiar with Gordon Creek,

12   this creek meanders quite a ways until it reaches a broad,

13   shallow bay called Nayses Bay, correct?

14   A.  Correct.

15   Q.  About how far from where the map is that -- where I've

16   pointed is Nayses Bay?

17   A.  It's several miles.

18   Q.  But you indicated on your direct exam you thought the

19   creek was several miles.  It's longer than several miles,

20   isn't it, Officer, from the river, from the main body of the

21   river to where you met Mr. Childers' son and Mr. Hodge?

22   A.  Correct.

23   Q.  Okay.  So I don't want you to guesstimate but is it fair

24   to say between 5 and 10 miles from the main body of the

25   river?

1    A.   From the main body -- to get all the way back to where

2    the homes were?

3    Q.   Correct.

4    A.   Correct.

5    Q.   Okay.  Now, in reference to that, just to inform the

6    Court, between the main body of the river and the point you

7    both circled and tried to -- and have the green dot, there

8    are numerous residences along the body of the creek, are

9    there not?

10   A.   Correct.

11   Q.   And there are also hunt clubs along the body of the

12   creek, correct?

13   A.   Correct.

14   Q.   And those are between where the dot is indicated and the

15   main body of the river, right?

16   A.   Correct.

17   Q.   Just to refresh your recollection, my recollection, is

18   the first hunt club you come to would be called Powhatan,

19   which owns property on both sides of the Gordon Creek,

20   correct?

21   A.   Correct.

22   Q.   A substantial amount of property?

23   A.   Correct.

24   Q.   And they are mainly water fowl hunters, are they not?

25   A.   Correct.

Howlett, Z. - Cross                                                      45

1    Q.  And they have a huge place that they call a reserve where
2    they don't hunt and they feed baits -- feed ducks in the
3    split.  Are you aware of that?
4    A.  Not to my knowledge.
5    Q.  Not to your knowledge.  The next hunting club would be
6    called Pinewood adjacent to Powhatan; is that correct?
7    A.  Correct.
8    Q.  And the next one would be Camp Paradise, again on the
9    same shore of the creek?
10   A.  Correct.
11   Q.  Then we have Laf A Lot, correct?
12   A.  Correct.
13   Q.  And that's the opposite shore.  And then others farther
14   up which may be just individual hunters, correct?
15   A.  Correct.
16   Q.  Now, there are also multiple residences, many more than
17   there are hunt clubs along the body of the creek before you
18   get to this dot, correct?
19   A.  Correct.
20   Q.  And it's true, is it not, that the residences are places
21   where people, you have found in your experience, you've
22   testified to, feed birds, including the water fowl, correct?
23   A.  Correct.
24   Q.  And when they feed them, they would use the things that
25   you've indicated are used to bait ducks, correct?

1    A.  It's a possibility.

2    Q.  So bait and food are the same thing depending on the eye

3    of the beholder, correct, Officer?

4    A.  Correct.  The type of grain that they would be using.

5    Q.  Right.  Right.  Now, let's talk about what's above the

6    dot because I think you testified that this Westport

7    subdivision through which you gained entrance by vehicle is

8    near the end of the creek, correct?

9    A.  Correct.  Navigable water.

10   Q.  Okay.  But in high tide you can go up above there all the

11   way to Jolly Pond, can you not?

12   A.  It would be difficult to navigate in a boat all the way.

13   I don't know if you could take a boat all the way to Jolly

14   Pond.

15   Q.  Have you ever been up there?

16   A.  In a boat -- by boat, no.  I have been to Jolly Pond but

17   not by --

18   Q.  No, I understand.  You look down the dam to where

19   Gordon's Creek ends?

20   A.  Correct.

21   Q.  And Gordon Creek begins, we are still away from the Jolly

22   Pond, empties into the head waters of Gordon Creek, correct?

23   A.  Correct.

24   Q.  Well, you've had experience as a warden and as a hunter.

25   Clearly, you could access areas where you couldn't go by

Howlett, Z. - Cross                                          47

```
 1   conventional boat, by a kayak or a canoe, correct?
 2   A.  Correct.
 3   Q.  Okay.  And that would be above Westport?
 4   A.  Correct.
 5   Q.  All right.  And that would be a place where people could
 6   hunt above Westport, correct?
 7   A.  Correct.
 8   Q.  Okay.  Now let's talk about Westport.  You indicated it
 9   wasn't gated, correct?
10   A.  Correct.
11   Q.  And that there was a no trespassing sign at the entrance?
12   A.  As you're pulling into the entrance of Westport, there is
13   a no trespassing sign in the median.
14   Q.  Okay.  There is also a big sign there on how many lots
15   are for sale, correct?
16   A.  I couldn't recall if there is or not.
17   Q.  You don't recall?
18   A.  No, sir.
19   Q.  While there were for sale signs on vacant lots in the
20   subdivision, were there not?
21   A.  There were.
22   Q.  Right.  And these are lots that are not being built upon,
23   correct?
24   A.  Correct.
25   Q.  All right.  And despite this sign and this camera, you or
```

1    I or the Judge could drive in there to check out the lots and
2    look at the signs, correct?
3    A.  Correct.
4    Q.  So your concern with the trespassing issue was whether
5    someone had a right to be in there, right?  Isn't that true?
6    A.  Correct.
7            MS. STERLING:  I'm going to object to that at this
8    point because we are not talking about a trespassing charge.
9    I understand he wants to get the factual situation but I
10   don't think the intent of the officer is really --
11           THE COURT:  Overruled.  I'll allow it, but let's
12   not belabor the point.  We are not here for trespassing.
13           MR. ROBERTS:  Yes, sir.
14   BY MR. ROBERTS:
15   Q.  Now, further discussion about Gordon Creek, Gordon Creek
16   is a tidal creek, is it not?
17   A.  It is.
18   Q.  And I'm sure the Court knows that means that there is two
19   high tides and two low tides every day, correct?
20   A.  Correct.
21   Q.  All right.  And during -- so that would mean during the
22   period of December 23rd, which is, I believe you said, the
23   initial report, right?
24   A.  From myself being there?
25   Q.  No, no, from the initial report, December 23rd.

Howlett, Z. - Cross                                          49

1  A.  I was informed December 22nd.

2  Q.  22nd.  All right.  From December 22nd to January 19th,

3  nine -- that's 28 days, roughly, a month?

4  A.  I'll trust your math.

5  Q.  Well, don't do that.  That would be roughly 120 different

6  tidal changes, correct?

7  A.  Correct.

8  Q.  And it's true, is it not, that this creek narrows as it

9  approaches -- it's up around, and particularly where you

10 found my client, correct?

11 A.  Correct.

12 Q.  It's not a uniform width all the way up there?

13 A.  No, sir.

14 Q.  And so when the tide comes in and the tide comes out as

15 it gets narrower, it runs more swiftly, does it not?

16 A.  Correct.

17 Q.  Okay.  And so for those 28 days, any food or bait or any

18 other substance that was on the surface of the creek had the

19 ability to move anywhere up and down the creek subject to the

20 tides, correct?

21 A.  Possibility, yes, sir.

22 Q.  And the wind, right?

23 A.  Correct.

24 Q.  All right.  You don't have any evidence, do you, Officer,

25 that this gentleman put out the materials that you saw on any

1    of the dates you've testified, do you?

2    A.  No, sir.

3    Q.  Okay.  Now, you talked about the location of my client,

4    his son and this other gentleman as being in the marsh and

5    one of the photographs -- Judge, may I see the exhibits?

6            THE COURT:  You may.

7    BY MR. ROBERTS:

8    Q.  Isn't it true, Officer, they weren't standing in the

9    marsh, they were in the woods adjacent to the marsh, correct?

10   A.  They were standing in the -- when the tide was out, they

11   would be standing in the tidal area so they would be --

12   Q.  All right.  Well, let's get it here.  Look at this

13   picture.

14   A.  I have it.

15   Q.  You got it?

16   A.  Yes, sir.

17           THE COURT:  If you can identify the number that

18   you're referring to on the back.

19           MR. ROBERTS:  I'm looking at Exhibit Number 4, and

20   I'm placing that on the projector.

21           Your Honor, can you see that?

22           THE COURT:  I see it.  Thank you.

23           MR. ROBERTS:  Ms. Sterling, you see it?

24           MS. STERLING:  I do.  Thank you.

25   BY MR. ROBERTS:

1    Q.  All right.  So see, these two trees you've pointed out
2    were places where the boat was, correct?
3    A.  Correct, on the other side of the trees.
4    Q.  So the hunters would have been, as you follow my finger,
5    around here somewhere (indicating)?
6    A.  That's incorrect.
7    Q.  Okay.  Put -- where would they have been?
8    A.  From where I was taking the picture, they would have been
9    somewhere in that area from where I was taking the picture.
10   Q.  So somewhere in here (indicating)?
11   A.  Well, back behind from where I was physically standing.
12   Q.  Okay.  But you didn't get a photograph of the actual
13   wooded line where you found them, correct?
14   A.  No, sir.
15   Q.  You did not, right?
16       And it would be your experience, as you've testified
17   as a duck hunter, that you wouldn't stand out in the middle
18   of the mud, regardless of the tide, to hunt, more value to
19   conceal yourself, correct?
20   A.  Correct.
21   Q.  And that's what they were doing?
22   A.  Correct.
23   Q.  All right.  Let's talk about your experience as a duck
24   hunter now.  How long have you been a duck hunter?
25   A.  I believe the first time I had duck hunted was when I was

1   12 years old with my father.

2   Q.  And you're what, 29 now?

3   A.  29.

4   Q.  Okay.  You said that you found about the same

5   concentration of ducks and geese each of the times you were

6   there, correct?

7   A.  Correct.

8   Q.  And, obviously, you've attributed that to the fact that

9   there was food out there, correct?

10  A.  Correct.

11  Q.  Did you see any ducks anywhere else on the creek as you

12  traveled up and down the creek?

13  A.  Every time I went in, I went in by foot.

14  Q.  So you don't know if there were ducks above the spot or

15  ducks below that spot, nor what concentration they were,

16  correct?

17  A.  Correct.

18  Q.  Have you ever hunted on Gordon Creek?

19  A.  On Gordon's, no, I have not.

20  Q.  Okay.  Well, is it a fair statement that that's a fairly

21  popular place to duck hunt up and down Gordon Creek?

22  A.  If you've got a blind -- if you're part of the hunt club

23  or have a stationary blind with --

24  Q.  What about if you've got a floating blind?

25  A.  I'm not aware of too many -- I mean, you know, but then

1  you -- the 500 yards of somebody but there's not many --

2  Q.  I understand, but subject to the law and you have a

3  right?

4  A.  If there is open areas, it would be popular, yes, sir.

5  Q.  All right.  And you also said, I think when Ms. Sterling

6  asked you, that the concentration that you saw there, you

7  thought, was unusual and attributable to the bait, correct?

8  A.  Correct.

9  Q.  And there are other reasons, as a duck hunter, I'm

10 speaking, where ducks would concentrate other than the food

11 you saw, correct?

12 A.  Correct.

13 Q.  Right.  It can be what's called a roost; isn't that true?

14 A.  Correct.

15 Q.  Tell the Judge what a roost is, if he doesn't know?

16 A.  A roost would be, you know -- typically at sunset you

17 will get concentrations of water fowl that are roost up for a

18 night, either, you know, if there are ducks, they are going

19 to roost in something up off the swamp, but geese and ducks

20 would probably roost right on the shoreline in a marsh area.

21 Q.  Well, is it fair to say this area of Gordon Creek looks a

22 lot like the roost that you've seen as a duck hunter?

23 A.  Very recently, yes, sir.

24 Q.  Okay.  There are also places where ducks concentrate

25 because of an impoundment, correct?

Howlett, Z. - Cross                                                         54

```
 1   A.  Correct.
 2   Q.  All right.  Can you tell the Court what an impoundment
 3   is?
 4   A.  Impoundment would be any type of flooded agricultural
 5   field such as like a foddered cornfield or a foddered soybean
 6   field or a rice field.
 7   Q.  And that's legal, right?
 8   A.  Correct.
 9   Q.  Have you ever been to Hog Island on the James River?
10   A.  I have not.
11   Q.  Have you ever been to Turkey Island up on the upper James
12   near Richmond?
13   A.  I have.
14   Q.  Lots of ducks up there, right?
15   A.  Yes.
16   Q.  Nobody's feeding them up there, are they?
17   A.  No.
18        MS. STERLING:  Your Honor, I'm going to object now
19   to the relevance of other areas.
20        THE COURT:  Sustained.  Let's keep it moving here.
21        MR. ROBERTS:  Well, Judge, may I comment?  I'm
22   trying.  He said it was unusual to see a couple dozen ducks
23   and some geese in this area.  I'm just trying to
24   cross-examine him about the unusualness of that
25   concentration.  That's all.
```

```
 1   BY MR. ROBERTS:
 2   Q.  All right.  Let's talk about the tides, then.  The first
 3   time you were out there, Officer, you've indicated that the
 4   property, the lot was not posted; is that correct?
 5   A.  Correct.
 6   Q.  All right.  And tell us again how many days these game
 7   cameras that you put up, one looking down the lane on the lot
 8   and one looking in the marsh, how many days total were they
 9   up?
10   A.  I don't have a specific day that mine was put -- both
11   cameras were put up on the 26th of December, and, um, I
12   pulled my camera on the 31st.
13              THE COURT:  And that's the parking lot cameras; is
14   that correct?
15              THE WITNESS:  Correct.
16              THE COURT:  All right.
17   BY MR. ROBERTS:
18   Q.  So you don't know the total dates.  Well, let's talk
19   about the 26th.  This photograph, which is Government's
20   Exhibit 2, I believe that's taken on the 24th, is it not?
21   A.  23rd.
22   Q.  23rd?
23   A.  Yes, sir.
24   Q.  So you don't know what happened prior to that out there,
25   do you?
```

Howlett, Z. - Cross                                          56

1    A.   For the three days?

2    Q.   Right.

3    A.   No, sir.

4    Q.   And you don't know what food was placed or whether it

5    floated up or down the creek from people feeding ducks on

6    their residential lots, correct?

7    A.   No, sir.

8    Q.   All right.  Now, I'm going to refer you to then

9    Government's Exhibit 5, and looking at my notes, 5 was taken

10   on the 19th, correct?

11   A.   Correct.

12   Q.   So between the 26th and the 19th, you don't know what

13   happened, either, do you?  When -- or did you say the 1st was

14   the day you removed the camera?

15   A.   The 31st was the day that I removed the camera.

16   Q.   Of December?

17   A.   Of December, yes, sir.

18   Q.   So for 18 days you have no idea what happened up there or

19   who might have been feeding or baiting or anything, correct?

20   A.   But the lot here, the other camera, although the swamp

21   was still up at that time, we had no evidence of any boat

22   activity on the plotwatcher when we looked --

23   Q.   Are you saying it was infrared?

24   A.   They are.

25   Q.   Okay.  But they would not detect anyone outside the view

1   of the camera placing food or bait, would they, obviously?

2   A.   Obvious.

3   Q.   And we talked about the tide, right?

4   A.   Right.

5   Q.   Okay.  You talk about seeing Mr. Childers on the lot in

6   question on December 27th, correct?

7   A.   Correct.

8   Q.   And he was with his son?

9   A.   Correct.

10  Q.   All right.  And that was between 9:51 and 10:00, I think

11  you said?

12  A.   Correct, I believe.

13  Q.   And so that wasn't for 20 minutes, it was roughly about

14  10 minutes, correct?

15  A.   Correct.

16  Q.   All right.  Did you see them with anything in their hands

17  or on their possession like a backpack or a bucket or

18  anything like that?

19  A.   No, sir.

20  Q.   Okay.  Now, you also testified, I think, that in your

21  experience as a duck hunter, that you're familiar with duck

22  hunting, usually done from stationary blinds, correct?

23  A.   Correct.

24  Q.   But there are other ways, for the edification of the

25  Court, to hunt water fowl, obviously?

1    A.   Correct.

2    Q.   And they are not unusual, are they?

3    A.   No.

4    Q.   And I would refer you to floating blinds, correct?

5    A.   Right.

6    Q.   What is jump shooting?

7    A.   Jump shooting, you -- typically, if you're in a -- some

8    type of vessel, um, maybe they'll push ducks out as long as

9    you're not underway through the motor, jump ducks would flush

10   up and you could shoot them that way.

11   Q.   But a classic example would be paddling a canoe with one

12   man paddling, one man in the front with the firearm, correct?

13   A.   Correct.  Correct.

14   Q.   And that's pretty usual, isn't it?

15   A.   Um, in that section of Gordon's Creek, I would say no.

16   Q.   Have you ever seen anybody jump shoot there?

17   A.   No.

18   Q.   But you've never been there before December the 22nd,

19   right?

20   A.   Correct.

21   Q.   All right.  So you really can't say whether people jump

22   shoot it?

23   A.   Correct.

24   Q.   All right.  And another way is to find a place where

25   there's natural cover of brush and shoot from the bank,

1    correct?

2    A.    Right.

3    Q.    All right.  And I won't go into sink boxes and curtain --

4    but the point is there are a lot of usual ways to water fowl

5    hunt other than from a stationary blind?

6    A.    Correct.

7    Q.    You've talked about the times you were there.  There were

8    different tidal times at each of your visits, were there not?

9    A.    Correct.

10   Q.    All right.  And let's get now to the 19th.  The Judge

11   wants us to move along; I want to move along.  On the 19th

12   you -- I believe you said you arrived at 5:45; is that

13   correct?

14   A.    Roughly, yes, sir.

15   Q.    Okay.  And my calculations, and I'm going to ask you if

16   you know, were that sunrise that day would have been

17   somewhere around 7:20 a.m., does that sound right?

18   A.    Sounds right, yes, sir.

19   Q.    And, of course, the Court knows the law says you can't

20   start water fowl hunting until 30 minutes prior to sunrise?

21   A.    Correct.

22   Q.    And there are adjustments so I've calculated that

23   shooting time there, I ask if you agree, was around 6:50

24   a.m.?

25   A.    No.

1  Q.  6:56, if you use 7:19?  When was shooting time that day?

2  A.  I'm not sure if I have -- well, let me see.  Check my

3  notes real quick.  It would have been, that's correct, the

4  6:50.  The first shot was at 6:56, and it was -- it was

5  shooting hours at the first shot.

6  Q.  No issues with the timing of the shots there, correct?

7  A.  Correct.

8  Q.  I've tried to find the tide chart for a year ago, and it

9  appeared to me that low tide on Gordon's Creek where you were

10  that morning was around 5:10 a.m.  Would that be consistent

11  with your observations?

12         MS. STERLING:  Your Honor, I'm going to object to

13  the testimony by counsel.  I don't know that he -- that

14  certainly wasn't brought up in direct.  I don't know that

15  he's acknowledged --

16         THE COURT:  If you could just ask the question, I

17  think --

18  BY MR. ROBERTS:

19  Q.  Do you know when low tide was at the site where you found

20  Mr. Childers' son and Mr. Hodge that morning?

21  A.  Where the tide was?

22  Q.  No.  When was low tide, if you know?

23  A.  I'm not sure of the time.

24  Q.  Okay.  Well, what you saw when you walked down to the

25  creek that morning, did it appear the tide was coming in or

1  going out?

2  A.  It would have been coming in.

3  Q.  Coming in.  So low tide was prior to that, obviously,

4  right?

5  A.  Correct.

6  Q.  Okay.  You've also testified on direct that it was

7  unusual, you thought, that there were no decoys put out,

8  correct?

9  A.  Correct.

10  Q.  All right.  If you're hunting a roost, you would scare or

11  get up the ducks if you went out and threw out decoys; isn't

12  that true?

13  A.  I've never hunted a roost so I would not know.

14  Q.  Well, think about it.  A roost is a place where --

15         MS. STERLING:  Your Honor, he said he does not

16  know.  I'd ask that he --

17         THE COURT:  Well, I think based on his expertise,

18  it's a fair cross-examination.  I'll allow it.  But, again,

19  ask questions.

20         MR. ROBERTS:  Yes.

21  BY MR. ROBERTS:

22  Q.  A roost is a place where they are sleeping overnight,

23  right?

24  A.  Right.

25  Q.  You're just waiting there for them to wake up and fly,

1   correct?

2   A.  Correct.

3   Q.  Isn't it true that if you were out there splashing around

4   throwing out decoys, you would disturb them, they would fly

5   away?

6   A.  Correct.

7   Q.  So it would not be unusual to not use decoys if you were

8   hunting a roost, correct?

9   A.  Right.

10  Q.  Isn't it true that if you jump shoot, which we've

11  discussed --

12       MS. STERLING:  Your Honor, I'm going to object.

13  Again, you're not talking about anything related to the

14  facts of the case in this particular line of questioning.

15  He's also indicated that he does not know about jump

16  shooting.

17       THE COURT:  Yeah.  We are not -- there is no issue

18  regarding jump shooting in this case.

19       MR. ROBERTS:  Here is the only -- I agree with you,

20  Judge, but here's the issue.  He said on direct examination,

21  and I believe that it's pretty important, that if you don't

22  put out decoys, that's unusual.  He said that as a warden

23  and as a duck hunter, it's unusual that you don't put out

24  decoys.  He said there were no decoys.

25       I was just trying to determine that he may have

1    missed a couple of places or opportunities for duck hunting,

2    even if we weren't jump shooting, where it wasn't unusual.

3    I think it's proper cross.

4              THE COURT:  All right.  Let's move through it

5    quickly.

6    BY MR. ROBERTS:

7    Q.  You don't use decoys when you jump shoot ducks, do you?

8    A.  No, sir.

9    Q.  So that's not unusual, right?

10   A.  Correct.

11   Q.  All right.  Let's talk about your interaction with

12   Mr. Childers and the other two hunters.  The first one you

13   saw was his son, he's up in the woods doing what he's doing,

14   correct?

15   A.  (No audible response).

16   Q.  Prior to that time were you able to determine the faces

17   or identities of the individuals down there?

18   A.  I could see that just those three individuals down there

19   from --

20   Q.  It's too dark, wasn't it --

21   A.  -- from my vantage point.

22   Q.  -- right?

23   A.  Correct.

24   Q.  It was too dark when they arrived, which you've indicated

25   the timing that they arrived --

1  A.  Correct.

2  Q.  -- to see who they were or what -- even what gender they

3  were, correct?

4  A.  Correct.

5  Q.  And it would be too dark to see what was in or on the

6  surface of the water at that time, correct?

7  A.  They had several flash -- the boat had a light on it.

8  Q.  Without a light, you couldn't see anything?

9  A.  Correct.  You would not be able to see.

10  Q.  All right.  Once the boat was parked at the trees, you

11  indicated --

12  A.  Yes, sir.

13  Q.  -- did anyone return to the boat where you later saw this

14  concentration of Milo?

15  A.  Not until myself and Mr. Childers walked back to the --

16  Q.  Right.  So the point is, the boat would have been parked

17  in the dark and would not have been returned to while it was

18  dark, correct?

19  A.  Right.

20  Q.  All right.  You said, I think, that the duck split -- and

21  I don't know, either, but the duck split that year was from

22  December 2nd to the 19th, I think, correct?

23  A.  I believe so.

24  Q.  So that means that there was a period of time prior to

25  the 2nd where there was a -- over the Thanksgiving holiday,

1    there was duck hunting allowed?

2    A.   Correct.

3    Q.   And then it's closed, and then it would reopen till

4    unusually the end of January?

5    A.   Yes, sir.

6    Q.   So you don't know what was going on in terms of feeding

7    or baiting or anything on that creek during that split,

8    correct?

9    A.   No, sir.

10   Q.   You don't know?

11   A.   The only thing during -- during that split when he was

12   out prior to the 22nd, I don't know what was going on that

13   creek.

14   Q.   Right.  Okay.  I think you said on direct exam that you

15   did, you and Officer Joyce did a compliance check, correct?

16   A.   Correct.

17   Q.   In case His Honor doesn't know, what are the things that

18   a game warden looks for from a duck hunter when you do a

19   compliance check?

20   A.   State home residence.

21   Q.   That was okay, correct?

22   A.   On Mr. Childers and his son, yes.

23   Q.   I'm talking about this man.

24   A.   Okay.  State high license, state stamp, federal duck

25   stamp.

Howlett, Z. - Cross                                                          66

```
1    Q.  That was okay, correct?
2    A.  Yes, sir.  What type of shotgun for a plug and --
3    Q.  Was that okay?
4    A.  You'd have to ask Officer Joyce, he checked weapons, but
5    in our report I did put that it was --
6    Q.  Okay.
7    A.  They were all in compliance.
8    Q.  What else?
9    A.  Shells for lead shot.
10   Q.  No problem there?
11   A.  No, sir.
12   Q.  The fact that it was in season?
13   A.  Is in season?
14   Q.  The fact that the gauge on the gun was correct?
15   A.  Correct.
16   Q.  In fact, there weren't any live decoys used, right?
17   A.  Right.
18   Q.  All those -- all right, sir.  Now, duck hunting as a
19   sport requires a lot of preparation; is that a fair
20   statement?
21   A.  Absolutely.
22   Q.  All right.  And just quickly I'm going to take you
23   through, you're going to have to have -- make sure the
24   boat --
25            MS. STERLING:  Your Honor, I'm going to object to
```

```
 1   the relevance of this.  Again, I don't see how this is
 2   leading us anywhere based on the direct examination.
 3            THE COURT:  Where are we going with this,
 4   Mr. Roberts?
 5            MR. ROBERTS:  Well, I don't know what you know
 6   about duck hunting, Judge.  I was going to try and point out
 7   from the expert and the officer all the time and investment
 8   that's put into a duck hunt, a particular duck hunt, which
 9   includes scouting.  You may recall there's testimony that my
10   client was seen on the lot prior to the day that they met
11   him.
12            THE COURT:  All right.  Well, let's ask about the
13   scouting, then.  What about that?
14   BY MR. ROBERTS:
15   Q.  All right.  After you do all the other stuff and pay all
16   the other money, one of the things you want to do is know if
17   there are any ducks out there, correct --
18   A.  Right.
19   Q.  -- right?  Because you don't want to sit there and do
20   nothing?
21   A.  Right.
22   Q.  And scouting can include going to a place you intend to
23   hunt and staying there for a while to see if water fowl are
24   about, right?
25   A.  Correct.
```

Howlett, Z. - Cross                                                          68

1   Q.  All right.  And so you could describe the visit of
2   Mr. Childers, which you've testified to --
3           MS. STERLING:  Objection.  This calls for
4   speculation, Your Honor.
5           MR. ROBERTS:  Well, I don't --
6           THE COURT:  Why don't you just ask him a question
7   rather than could.
8   BY MR. ROBERTS:
9   Q.  December 27th is a scouting trip, right?
10          MS. STERLING:  Objection again, Your Honor.
11          THE COURT:  Rephrase the question.  Do you have any
12  knowledge whether, when you saw Mr. Childers and his son on
13  December 27th, they were scouting?
14          THE WITNESS:  I may not watch for that.
15          THE COURT:  Thank you.
16  BY MR. ROBERTS:
17  Q.  And he has no knowledge they weren't, either, correct?
18  Is that correct?
19  A.  Correct.
20          MR. ROBERTS:  Thank you, Your Honor.  Judge, may I
21  have just a second?
22          THE COURT:  You may.
23  BY MR. ROBERTS:
24  Q.  Now, to the sharp point of the stick here, Officer, you
25  questioned my client after you did the safety and the

1    compliance check and got him away from the site, correct?

2    A.   Correct.

3    Q.   All right.  And he made a statement about the bait,

4    correct?

5    A.   Correct.

6    Q.   And tell us again what that statement was.

7    A.   Mr. Childers stating that the individual that put the

8    bait out was not hunting with him.  I questioned Mr. Childers

9    about the name of that individual that placed the bait, but

10   he did not want to give out any names.  Mr. Childers made the

11   acknowledgement that he knew bait was there but made a

12   comment that since he did not put the bait out, that he was

13   good to hunt the area.

14   Q.   And your report, you're quoting that verbatim, how long

15   after the incident was this report prepared?

16   A.   That would have been -- I don't have an exact date on

17   when it was --

18   Q.   Well, no, I didn't ask you for the -- how long?  A day, a

19   month, a week, two weeks?

20   A.   The report was probably written somewhere up there

21   probably a couple weeks, but --

22   Q.   Did you make notes of Mr. Childers' statements --

23   A.   I did.

24   Q.   -- that day?

25   A.   I did.

Howlett, Z. - Cross                                                      70

1  Q.  You did.  Do you recall that he said that he knew an area
2  on Gordon Creek was baited during the split instead of the
3  area where he was standing was baited?
4  A.  I do not recall that.
5  Q.  You don't recall that.  So he could have said that and
6  you just don't recall, correct?
7  A.  Correct.
8  Q.  And do you recall him mentioning Jolly Pond, which we've
9  already exhausted ad nauseam, is up at the head of the creek?
10 A.  He made no knowledge to me about Jolly Pond.
11 Q.  Okay.  In fact, he said he didn't know where the
12 individual was who might have baited this, correct?
13 A.  Correct.  I asked Mr. Childers did that individual that
14 put the bait out was not hunting with them, and he did refuse
15 to give the name of that individual that placed the bait out.
16 Q.  Well, my final question, then, would be, Officer Howlett,
17 thank you for your patience, if Mr. Hitchens -- again, I'm
18 looking at our map, which would be Government's Exhibit 1,
19 Mr. Hitchens, who owns all this shoreline I'm outlining; is
20 that correct?
21 A.  Correct.
22 Q.  If Mr. Hitchens had put food out from his lot to the BB's
23 Dust --
24        MS. STERLING:  Your Honor, calls for speculation,
25 and there is no foundation.

JODY A. STEWART, Official Court Reporter

1          MR. ROBERTS:  He said the people feed the ducks
2     along the creek, Judge.
3          THE COURT:  I'm going to sustain the objection.
4          MR. ROBERTS:  Thank you for your candor, Officer.
5                    REDIRECT EXAMINATION
6     BY MS. STERLING:
7     Q.  Mr. Howlett, first, with regard to all of these hunt
8     clubs, the Powhatan Club and all those that you mentioned in
9     response to Mr. Roberts' questions, those are all beneath
10    where the dock is, where you found --
11    A.  Correct.  They would all --
12    Q.  -- is that correct?
13    A.  -- be out towards the mouth.
14    Q.  Towards the mouth.  And there are lots of them where
15    people can duck hunt in blinds, correct?
16    A.  Correct.
17    Q.  Did you have any conversation with or knowledge as to
18    whether Mr. Childers was involved in these hunt clubs?
19    A.  I believe Mr. Childers was a member of Pinewood Hunt
20    Club, a current member, and the other individual in question
21    was a member of the Paradise Hunt Club.
22    Q.  So it would have been possible to hunt at these hunt
23    clubs using blinds and that is common in the Gordon Creek
24    area --
25    A.  Correct.

1   Q.  -- by your testimony?

2       Okay.  Did Mr. Childers indicate to you that he was

3   familiar with the area, the Gordon Creek area?

4   A.  Not directly, but he had stated that he had been in that

5   area before.

6   Q.  Okay.  Well, if you participate in the hunt club, that

7   would indicate that he was familiar, correct?

8   A.  Correct.

9   Q.  Okay.  And did he also indicate to you his history as a

10  duck hunter, whether he was experienced or for how long a

11  period of time he might have been a hunter?

12  A.  He did not make any direct comment on how long he had

13  been a hunter.

14  Q.  Do you happen to know from your investigation?

15  A.  Into the '90s, I believe, through investigation.

16  Q.  Okay.  All right.  So it has been some period of time,

17  correct?

18  A.  Correct.

19  Q.  And you indicated in response to Mr. Roberts' question

20  that Gordon Creek was a popular place to hunt if you have a

21  blind, correct?

22  A.  Correct.

23  Q.  And have you ever seen any other type of hunting;

24  floating blinds, jump shooting, people shooting from the

25  shore?  Have you ever seen that before?

1    A.  I've seen some of the club members will hunt out of a

2    blind, a floating blind.

3    Q.  Okay.

4    A.  But for the majority as law enforcement, they are hunting

5    out of stationary blind.

6    Q.  Okay.  All right.  And the way the pond -- the water flow

7    is from the pond into the bay, does it not?

8    A.  It would -- from Jolly Pond?

9    Q.  Jolly Pond.

10   A.  It would flow down past -- I mean, the headwater would

11   start, in looking at the map, just, you know, north of where

12   it goes off the paper.

13   Q.  Right.

14   A.  Jolly Pond would be north of that, but it would all be

15   flowing down.

16   Q.  So, correct me if I'm wrong, would you expect, if there

17   was something placed in the water, Milo or anything else

18   south of where the spot where you contacted Mr. Childers,

19   would that be going up towards the area?  Would water be

20   flowing, carrying anything from the bay up into Jolly Pond?

21   A.  Not up into Jolly Pond from the bay, no.  I mean, it

22   would have to go up over the spillway.

23   Q.  Right.  So, and, again, the hunt clubs are all south of

24   the spot where you came in contact --

25   A.  Correct.

Howlett, Z. - Redirect                                          74

1   Q.  And are there hunt clubs north of that, to your
2   knowledge?
3   A.  There is some deer hunting clubs up north that I'm aware
4   of, yes.
5   Q.  Okay.  And you indicate on cross that residents along the
6   creek north of the spot where you came in contact with
7   Mr. Childers might have fed ducks; is that correct?
8   A.  Correct.
9   Q.  And what -- what would that involve?  Would you happen to
10  know?
11  A.  When I spoke to Mr. Hitchens, he stated that he did feed
12  ducks but it was just off of his dock, right down off of his
13  shoreline by his house.
14  Q.  Would you expect to find the quantity of corn and Milo
15  that you found at the location where you came in contact with
16  Mr. Childers --
17  A.  No, ma'am.
18          MR. ROBERTS:  Judge --
19          MS. STERLING:  Let me just ask the question before
20  anybody --
21  BY MS. STERLING:
22  Q.  -- in an area where people were feeding ducks?
23  A.  No.
24  Q.  All right.  I'm sorry.  Go ahead.
25          MR. ROBERTS:  I don't think he's been qualified as

1    an expert in hydrology or stream geography or biology,

2    Judge.  That's a very damaging -- that's an opinion.  I

3    object to his opinion testimony.

4            THE COURT:  Are you an expert in hydrology?

5            THE WITNESS:  I have a class one waterworks state

6    license, if that means anything.  I worked at a surface

7    water treatment plant for six and a half years for the City

8    of Williamsburg.

9            THE COURT:  I think hydrology has to do with are

10   you an expert in --

11           THE WITNESS:  But, no, I'm not in hydrology, not in

12   flow of water, no.

13           THE COURT:  All right.  Thank you.

14   BY MS. STERLING:

15   Q.  Well, I'm asking, then, about your experience as far as

16   people putting out duck -- food to --

17   A.  The quantity that would be placed out by an individual,

18   in my opinion --

19   Q.  Or your experience?

20   A.  -- or my experience would not be the quantity that was

21   found at the site.

22   Q.  Okay.  Now, Mr. Roberts described to you a roost,

23   correct?

24   A.  Correct.

25   Q.  On the times that you came to this area on December the

1  23rd, again on the 26th, on the 18th of January and the 19th,

2  did you believe that those birds were roosting?

3  A.  According to my times, on the 23rd was at 11:00 in the

4  afternoon, so that would not be a roost time that the birds

5  would have jumped up.

6  Q.  What does a roost time mean?

7  A.  It, essentially, is in the evening right before dark, the

8  birds will go to roost.

9  Q.  Right.

10  A.  And then typically in the morning at first light, they

11  will come out of their roost to go feed.

12  Q.  Okay.  So tell us -- okay.  You said on the first

13  occasion on the 23rd of December --

14  A.  The 23rd was at 11:00 in the afternoon, the 26th was at

15  7:30 in the morning.  The 26th we also returned back at 1523.

16          THE COURT:  Were either of those roost times?

17          THE WITNESS:  No.

18  BY MS. STERLING:

19  Q.  Okay.  And when you came down on the 19th, and you said

20  that you arrived there about 5:45.  You were there at

21  sunrise.  Did you see the birds come out from a roost?

22  A.  I only saw the birds come out right as the boat was

23  coming up into the water, which jumped all the birds out that

24  morning.

25  Q.  Okay.  And that wasn't surprising to you?

Howlett, Z. - Redirect                                              77

```
 1   A.  No.

 2             THE COURT:  Say that again.  I'm sorry.  Give me --

 3             THE WITNESS:  When the boat with the mud motor on

 4   the back, which is a pretty loud motor, came up the creek to

 5   where I was at where they dropped the hunters off, the

 6   approximate that they got to the shoreline caused the geese

 7   and the birds to all jump up and fly out of the area.

 8             THE COURT:  All right.  Thank you.

 9   BY MS. STERLING:

10   Q.  Okay.  And there was no impoundment or flooded field from

11   which these grains could have come from, correct?

12   A.  Not to my knowledge.

13   Q.  No agricultural runoff missing?

14   A.  Not to my knowledge, no.

15   Q.  And each time that you went down to the area on these

16   different occasions, it was clear to you that there was

17   grain, corn and Milo in the water, that was clear to the

18   naked eye, correct?

19   A.  Correct.

20   Q.  Okay.  And that was clear to -- including on the 18th,

21   the day before you came --

22   A.  Correct.

23   Q.  Okay.  All right.  Okay.  You indicated that the boat, it

24   was dark when you saw the boat on the 19th but it did have

25   lights?
```

1   A.  Correct.

2   Q.  And could those have been used to survey the water area

3   or the area to determine whether bait was out there?

4   A.  They could have, yes.

5   Q.  And is that a normal practice?  I mean, do -- let me ask

6   you the question, when you're duck hunting, do you normally

7   go out before sunrise to get yourself situated?

8   A.  Correct.

9   Q.  And would you bring lights so that you could see the area

10  around you?  Would that be a --

11  A.  Normally, you only have a flashlight or something of that

12  nature to where you could see what you were doing.

13  Q.  And in this case the boat had its own light, correct?

14  A.  The boat had a light on the front, yes, ma'am.

15  Q.  And then, finally, you indicated that you -- that you

16  prepared your report from notes, and the statement of

17  Mr. Childers, did you make notes of that or a note of that at

18  the time that it was made from which you subsequently

19  prepared your report?

20  A.  I made a note of when the bait was present at that

21  setting there on the 19th at 2:56 in the afternoon.

22  Q.  Okay.

23  A.  So that would have been the day of.

24  Q.  But did you make a note about the exact nature of his

25  statement to you about the baiting?

1    A.   That was the only -- on the 19th at 2:56 where I made an

2    actual note in our CAD system on our computer of what the

3    statement was.

4    Q.   In your computer.  So you maintained that --

5    A.   Correct.

6    Q.   -- and used that when you prepared your report?

7    A.   Correct.

8              MS. STERLING:  Okay.  Thank you very much.

9              THE COURT:  Recross, quickly.

10             MR. ROBERTS:  Four or five.

11                      RECROSS-EXAMINATION

12   BY MR. ROBERTS:

13   Q.   I think you said when you were confronted with my client

14   about the bait, he had a flabbergasted look on his face; is

15   that correct?

16   A.   Correct.

17   Q.   He was surprised?

18   A.   Correct.

19   Q.   All right.  You talk about, and Ms. Sterling talked

20   about, the fact that nothing could flow up to Jolly Pond up

21   the creek.  And you answered that's correct because there is

22   a dam, correct?

23   A.   Correct.

24   Q.   But things could flow when the tide turns and the wind is

25   right, right up to the base of the dam, could they not?

1  A.  They could.

2  Q.  This isn't a stream like a trout stream where there is a

3  constant flow in one direction; isn't that true?

4  A.  Right, it's tidal.

5  Q.  All right.  So it's possible that things flow up and down

6  all the way to the dam on Jolly Pond?

7  A.  It's possible, yes.

8  Q.  Which you said was seven miles above where you found my

9  client?

10  A.  Correct.

11  Q.  All right.  The Judge asked you about roost times for

12  your visit.  There is no chart or book or any way to

13  determine what a roost time is, is there?

14  A.  There is, no.

15  Q.  No.  And some birds leave in the morning and never come

16  back until dark and some come back in the middle of the day

17  after feeding in the field, and some stay all day long,

18  correct?

19  A.  Correct.

20  Q.  Ms. Sterling asked you about the possibility of

21  agricultural runoff on Gordon Creek.  I think you said on

22  cross you've never been from the dam, other than looking off

23  the dam, to the point where you saw Mr. Childers, you never

24  visited that area at all, have you?

25  A.  I'm familiar with the area but I've never physically set

1    foot on it.

2    Q.  All right.  So there could be a little garden patch or a

3    farm up there, right?

4    A.   Not to my knowledge, there isn't.

5    Q.  I understand not to your knowledge.  My question is, you

6    said there is not agriculture --

7    A.  Right.

8    Q.  -- below the dam to the point you met, and you don't know

9    whether there is or not, do you?

10   A.  Correct.

11   Q.  Now, the last point.  I said five.  You talk about the

12   running lights or the lights on the boat.  You're talking

13   about the red and green light on the bow to comply with

14   safety regulations, aren't you?

15   A.  The light bar on the front of the bar.

16   Q.  Right.  And that's a red and green light?

17   A.  Well, you have your bow light but there are also -- there

18   was also a -- a white -- a white bar on the front of the

19   boat.

20   Q.  And that was on?

21   A.  When they came up the creek, it was on.

22   Q.  Did it turn off as they got to the place where the

23   hunters were dropped?

24   A.  No.  The hunters were dropped, it was turned off.

25   Q.  So you couldn't see where -- what was going on where the

1   boat was parked, correct?

2   A.  I couldn't move --

3   Q.  If you're on the boat, you couldn't see because the light

4   bulb was off?

5   A.  Right.

6           MR. ROBERTS:  All right.  Thank you, Officer.

7   That's all the questions.

8           MS. STERLING:  Be very brief.

9                    REDIRECT EXAMINATION

10  BY MS. STERLING:

11  Q.  Officer Howlett, you're familiar with the Gordon Creek

12  area, correct?

13  A.  Correct.

14  Q.  It's not an area where farming is conducted, correct?

15  A.  You mean the immediate area where this was at, no.

16  Q.  Okay.  And is it -- is there any area of the Gordon Creek

17  area where you know of where there could -- the farming is

18  going on?

19  A.  Further down towards Nayses Bay, there is.

20  Q.  Not farther up?

21  A.  No.

22  Q.  Okay.  And, finally, the question of roosting, your

23  testimony is that the birds flying up occurs at approximately

24  sunrise and sunset, correct?

25  A.  Typically, yes.

```
 1            MS. STERLING:  Thank you.
 2            THE COURT:  All right.  Let's hand me those
 3    pictures.  I want to make sure we deal with the evidence
 4    before we finish with Officer Howlett.
 5            MR. ROBERTS:  Judge, I remove any objections to the
 6    pictures.
 7            THE COURT:  I understand.  I just want to clarify.
 8    Thank you for notifying me of that.
 9            MR. ROBERTS:  If it please the Court, I have
10    Government 1 as the map.
11            THE COURT:  Yeah.  I'm going to go right through
12    it.  So we will deal with this now.  1 is the map, that's
13    correct.  I'm looking at Exhibit 5 which purports to show
14    seed in the water along with what looks like dead marsh
15    grass.  I'm holding it up.
16            THE WITNESS:  Yes, sir.
17            THE COURT:  When was this picture taken?
18            THE WITNESS:  That was taken on the 19th, sir.
19            THE COURT:  Government's Exhibit 5 will be
20    admitted.
21            (The document was received in evidence as
22    Government's Exhibit No. 5.)
23            THE COURT:  Government's Exhibit 2, when was this
24    taken?  I'm showing it to you.  It also shows what appears
25    to be corn and reflection on top of the water.  Was this
```

Howlett, Z. - Redirect                                                84

```
 1  taken December 23rd?

 2            THE WITNESS:  December 23rd, 2018, Your Honor.

 3            THE COURT:  All right.  That will be admitted.

 4            (The document was received in evidence as

 5  Government's Exhibit No. 2.)

 6            THE COURT:  Government's Exhibit 1, the map will be

 7  admitted.

 8            (The document was received in evidence as

 9  Government's Exhibit No. 1.)

10            THE COURT:  Government's Exhibit 3 is the log that

11  purports to show seed on it.  That was taken on January

12  18th; is that correct?

13            THE WITNESS:  Correct, Your Honor.

14            THE COURT:  That will be admitted.

15            (The document was received in evidence as

16  Government's Exhibit No. 3.)

17            THE COURT:  Government's Exhibit 4 is the picture

18  of the water with the two trees in the background.

19            THE WITNESS:  January 19th.

20            THE COURT:  January 19th.  Are you saying you saw

21  the hunters in this area from the -- between you, holding

22  the camera, and those two trees or somewhere else?

23            THE WITNESS:  They were hunting, from where I was

24  standing taking that picture, they would have been standing

25  to my back.  Where the boat was parked, Mr. Childers would
```

JODY A. STEWART, Official Court Reporter

Howlett, Z. - Redirect                                              85

```
 1    have walked across that swamp or the marsh there -- where
 2    the mud is, to get to the other hunters where he had dropped
 3    them off.
 4              THE COURT:  You are saying the boat was parked
 5    behind the two trees?
 6              THE WITNESS:  Correct.
 7              THE COURT:  And the hunters were behind where you
 8    were taking this picture?
 9              THE WITNESS:  Correct.
10              THE COURT:  That is Government's Exhibit 4.  That
11    will be received into evidence.
12              (The document was received in evidence as
13    Government's Exhibit No. 4.)
14              THE COURT:  Exhibit 5 is the Milo seed that's
15    already in evidence.  No, I'm sorry.  That's 6.  Exhibit 5
16    was the -- I already dealt with that.  That's the Milo seed
17    that was shown on January 19th.
18              Exhibit 6 is the actual Milo seed samples.  Did you
19    collect these on the date in question?
20              THE WITNESS:  Correct.
21              THE COURT:  And were they in the water?
22              THE WITNESS:  They were in the water, yes, sir.
23              THE COURT:  And 7 is the birds.  That's already in
24    evidence.
25              I had a question or two for you.  Let me just find
```

 1    them.  So I didn't understand fully your testimony about

 2    where you saw Milo seed that you referred to being at the

 3    base of someone's feet.  Was that in the boat, was it

 4    outside the boat?  Where were you referring to?

 5              THE WITNESS:  When the boat was parked right next

 6    to those two trees, I was standing on -- right at the

 7    baseline of the water.  Mr. Childers was inside the boat.  I

 8    could look down at the water and see Milo right at where the

 9    water, shoreline was at, essentially.

10              THE COURT:  And did you see any other kind of bait

11    inside the boat itself?

12              THE WITNESS:  Not inside the boat, no.

13              THE COURT:  Officer, those were the only questions

14    I had.  You may step down.

15              (Witness excused.)

16              THE COURT:  If we could, we've got the prior

17    Mrs. Faircloth, I believe, here.  I'd like to deal with the

18    matter concerning her.  Mr. Cole, Ms. McCaslin, if you

19    can -- we will take a brief recess on Mr. Childers' case to

20    deal with that.

21              (Recess from 11:54 a.m. to 12:21 p.m.)

22              THE COURT:  Are you ready with your next witness?

23              MS. STERLING:  Yes, Your Honor.  Your Honor, I do

24    have another conservation officer, Officer Joyce is here.

25    But I think what he would testify to has pretty much been

Mena, C. - Direct                                                    87

```
 1    covered by Officer Howlett, so I'm going to call -- I'm
 2    going to ask that he remain, Officer Joyce, but I would call
 3    the federal officer, Officer Mena.
 4              THE COURT:  Very well.
 5              MS. STERLING:  In the interest of moving things
 6    along.
 7              THE COURT:  If you would come forward, sir, and be
 8    sworn.
 9              (Witness was sworn.)
10              CHRISTOPHER LEE MENA, called by the Government,
11    having been first duly sworn, was examined and testified as
12    follows:
13                        DIRECT EXAMINATION
14    BY MS. STERLING:
15    Q.  Please state your name for the Court, sir.
16    A.  It's Christopher Lee Mena.
17    Q.  And how are you employed?
18    A.  I'm a special agent with the United States Fish and
19    Wildlife Service.
20    Q.  And what do your duties entail?
21    A.  Enforcement of federal wildlife laws, including the
22    Migratory Bird Treaty Act.
23    Q.  And how long have you been a federal wildlife officer?
24    A.  I started my employment with the Fish and Wildlife
25    Service in August of 2011.
```

1  Q.  And as you indicated, part of your duties are enforcement

2  of Migratory Bird Treaty Act, correct, and regulations

3  promulgated thereto?

4  A.  Yes, ma'am.

5  Q.  And that includes ducks?

6  A.  Yes, ma'am.  Migratory birds are classified as ducks,

7  geese and gallinules.

8  Q.  And in your capacity as a federal officer, did you become

9  involved in late December 2018/early January 2019 in

10 investigation of a baiting incident at Gordon Creek and James

11 City County --

12 A.  Yes, ma'am.

13 Q.  -- in Virginia?

14        And that's -- that location is in the Eastern

15 District of Virginia; is that correct?

16 A.  It's James City County within the Eastern District, yes,

17 ma'am.

18 Q.  And how did you become involved in that investigation?

19 A.  Officer Zach Howlett contacted me after investigating a

20 baiting case and contacting individuals there hunting while

21 in the presence of bait.

22 Q.  And what did you hear after you were contacted by Officer

23 Howlett?

24 A.  I reviewed the evidence that Officer Howlett collected,

25 along with discussing the case with him, Officer Howlett and

Mena, C. - Direct                                                              89

1    myself interviewed a Mr. Larry Childers about his involvement

2    in hunting that area on January 19th.

3    Q.  And why is it that Mr. Howlett came to you as a federal

4    officer in this particular case?

5    A.  Migratory birds are protected by both federal and state

6    law.  Generally, with the Fish and Wildlife Service and the

7    Virginia Department of Game and Inland Fisheries, they will

8    bring all of their cases to us to review to see if they are

9    appropriate for federal prosecution, if the ticket is not

10   issued in the field for a state violation.

11   Q.  Correct.  So, then, it wouldn't be unusual for someone to

12   be investigated and be told we are not issuing you a ticket

13   right now because we are consulting with the federal

14   agencies?

15   A.  No, ma'am.  I, myself, don't issue tickets in the field

16   at all.

17   Q.  Okay.  And so when was it that Officer Howlett first

18   contacted you?

19   A.  It was on or about January 21st.

20   Q.  And when you say reviewed his evidence, what did that

21   include?

22   A.  He presented me with photographs of the area, an overview

23   map of the area the hunters were located.  He also provided a

24   bait sample of bait that was collected at the time of his

25   inspection of the hunters, and then we discussed his notes

Mena, C. - Direct                                                    90

1    and what his field contact was with Mr. Childers and the two

2    other hunters there.

3    Q.  Okay.  And specifically what you were reviewing were his

4    items related to his investigation of the baiting incident

5    that he observed on the 19th of January, correct?

6    A.  Yes, ma'am, that specific -- the bait he found and the

7    issue surrounding the hunting of that area.

8    Q.  Okay.  So you indicated that you spoke with Mr. Larry

9    Childers; is that correct?

10   A.  Yes, ma'am, on February 5th.

11   Q.  Of 2019?

12   A.  Yes, ma'am.

13   Q.  And do you see him here today?

14   A.  I do.  He is --

15          MR. ROBERTS:  We will stipulate.

16          THE COURT:  For the record, he's identified the

17   defendant.  The defense has stipulated.  Thank you.

18   BY MS. STERLING:

19   Q.  Where and when did you come in contact with Mr. Childers?

20   A.  We contacted Mr. Childers at his residence in Seaford.

21   Q.  Okay.  And that's Seaford, Virginia?

22   A.  Yes, ma'am.

23   Q.  And where is that located in relation to Williamsburg,

24   Virginia?

25   A.  Approximately 30 minutes away.

Mena, C. - Direct                                                    91

1   Q.  And where in Seaford did you come in contact with him?

2   A.  At his residence.  I have the address here in my notes.

3   Q.  Okay.

4           MR. ROBERTS:  Judge, if this is about *Miranda*,

5   we've got no issues with --

6           MS. STERLING:  No.  No.  I'm going to move on.

7   BY MS. STERLING:

8   Q.  So were you by yourself or were you with someone else

9   when you went to his residence?

10  A.  Officer Howlett was with me.

11  Q.  Okay.  So when you went to the residence, how did you

12  come to speak to Mr. Childers?  What occurred?

13  A.  We knocked on the door -- approached his house, knocked

14  on the door several times.  Mr. Childers -- no one answered

15  the door initially.  We were walking away from his residence

16  and noticed a minivan sitting in the front driveway and a

17  large dump truck.

18          While we were sitting at the road, Mr. Childers and

19  someone he identified as his wife exited the property, and we

20  walked up to them and spoke to them in the driveway of his

21  residence.

22  Q.  Okay.  And did you know it was Mr. Childers or was

23  Mr. Howlett able to identify him?

24  A.  Mr. Howlett was able to identify him, and then through

25  conversation he identified himself as Larry Childers.

Mena, C. - Direct                                                    92

1    Q.   And did you identify yourself?

2    A.   I did, yes, ma'am.

3    Q.   And did you have a conversation with Mr. Childers about

4    the events of January the 19th?

5    A.   We did, yes, ma'am.

6    Q.   Okay.  Can you tell us about that conversation, please.

7    A.   We initially asked Mr. Childers about the incident.

8    Mr. Childers stated that he did, in fact, hunt the area in

9    Gordon's Creek, that Officer Howlett identified to me in

10   his -- the review map that he had provided me.

11   Q.   Was that on the date in question on January --

12   A.   January 19th, yes, ma'am.

13   Q.   Did he indicate he had hunted at any other time?

14   A.   Yes, ma'am.  He said that he had hunted the general area

15   in several times prior to that.

16   Q.   Okay.  Go ahead.

17   A.   When asked about the incident, Mr. Childers stated that

18   he was aware that someone had put bait out in the area during

19   the split in the season.  So the split -- hunting season

20   runs, and right now it's closed from December 1 to December

21   19th, and that's what is often referred to as the split.  So

22   it's an open hunting season, a closed portion, and then it

23   opens back up.

24   Q.   Is that just for migratory game birds?

25   A.   That is just the migratory game birds for the season.

Mena, C. - Direct                                                    93

1    Q.  So the split would have been --

2    A.  The closed --

3    Q.  -- somewhere around the first three weeks of December,

4    correct?

5    A.  Yes, ma'am.

6    Q.  Okay.  Go ahead.

7    A.  So Mr. Childers stated that he was aware that an

8    individual had placed bait in the area.  When I asked him who

9    the individual was, he said that he would not provide the

10   name of the individual that placed the bait.  I also asked

11   Mr. Childers if he -- the morning of the hunt if he did

12   anything to inspect the area prior to hunting for the

13   presence of bait.  Mr. Childers stated he did not.

14         We further discussed it, and I asked him did he --

15   was the area able to be inspected had he chose to, and he

16   said, yes, that the area was about 20 to 30 yards wide, that

17   a boat could easily pass between the banks, and it would have

18   been easily inspected but he chose not to.

19   Q.  Okay.  And as far as the Westport area, the area where

20   this had occurred, did you ask him how he came to be there?

21   A.  He told us that at the date that he traveled there by

22   boat to hunt on the 19th.

23   Q.  Okay.  Did -- was this -- what type of an area was it?

24   Was it a --

25   A.  It's a large area, so there's a channel of the creek that

Mena, C. - Direct                                                    94

1    Gordon's Creek that runs through, and then the area is banked
2    by a marsh, a low round marsh.
3    Q.  Do you know whose property it was?
4    A.  I do not know whose it was.  I was involved with the
5    interview of a Tommy Hitchens who said that it was not his
6    property.
7    Q.  That's okay.  Did you ask Mr. Childers or discuss with
8    him whether he had permission to be in that area?
9    A.  I did.  And Mr. Childers stated that it -- the property
10   he believed belonged to a Mr. Childers and that he had
11   permission from him, and we followed up and asked the
12   question, if it wasn't Mr. Childers' property, did you have
13   any permission to be on the property from anyone else, and he
14   said, no, he did not.
15            THE COURT:  You said Childers twice.  Did you mean
16   Mr. Hitchens?
17            MS. STERLING:  Mr. Hitchens?
18            THE WITNESS:  No.  During the interview, Your
19   Honor, Mr. Childers stated that he was hunting on the
20   property on January 19th and that it was Mr. Hitchens'
21   property.  We then asked Mr. Childers if it was not
22   Mr. Hitchens' property, did he have permission from anyone
23   else to be there, and he said no, Your Honor.
24   BY MS. STERLING:
25   Q.  Okay.  And he did admit to you to having shot migratory

1  game birds on the 19th in the area in question; is that
2  correct?
3  A.  Yes, ma'am.  He stated that he obviously had one
4  migratory game bird.
5  Q.  Did you have any discussions with him about his prowess
6  or his hunting migratory game?
7  A.  Yes, ma'am.  He said he's been an avid hunter for 43
8  years and that he's been regularly traveling to Saskatchewan
9  and also hunting in Virginia.
10  Q.  Okay.  And you said, I believe, that he told you he had
11  hunted in the general area of Gordon Creek several times
12  before?
13  A.  Yes, ma'am.
14  Q.  Okay.  Did you have any discussion with him regarding
15  hunt clubs on Gordon Creek?
16  A.  Yes, ma'am.  He said that he was a member of Pinewood
17  Hunt Club that had access to a boat launch near the area
18  which he was hunting.  I further asked him if he was hunting
19  in the area as a member of the hunt club or a private
20  individual, and he stated that he was not hunting there as a
21  member of the hunt club, that he was hunting as a private
22  individual.
23  Q.  Are you familiar with Pinewood Hunt Club?
24  A.  I am not, ma'am.
25  Q.  Okay.  Did you ask him why he was not hunting at the hunt

Mena, C. - Direct                                                    96

1   club?

2   A.  I did not.

3   Q.  Okay.  All right.  Thank you.  And I want to show you

4   what's been marked as Government's Exhibit Number 8.

5           MR. ROBERTS:  I'm going to object to the relevance

6   of this, but I guess --

7           THE COURT:  Let's have him identify first --

8           MS. STERLING:  Have him identify it.

9           THE WITNESS:  Yes, ma'am.  That's a photograph that

10  I took on February 5th, 2019.  It depicts empty bags that

11  were labeled as shelled corn.  They were observed in the

12  back of a minivan parked in the front of Mr. Childers'

13  residence.

14  BY MS. STERLING:

15  Q.  Did you ask him about that?

16  A.  I did.  At the end of the interview I asked him about the

17  empty bags of corn, and he stated that there was nothing that

18  prevented him from feeding the ducks at the local pond.

19          MS. STERLING:  Thank you.  We move to introduce

20  Government's Exhibit Number 8.

21          THE COURT:  Any objection?

22          MR. ROBERTS:  Yes, sir.  I object to the relevance.

23  If I understand Agent Mena's testimony, this interview

24  occurred on February the 5th, which would be 17 days after

25  the incident in a van that didn't belong to Mr. Childers.  I

Mena, C. - Direct                                                      97

1    think it was identified as his wife's van.  So I don't see

2    the relevance of the photograph or the statements about the

3    photograph, and I would object to their introduction.

4              THE COURT:  The bags that you're referring to, are

5    they these green and red and tan --

6              THE WITNESS:  Yes, sir.  They are camouflaged bags.

7    There were multiple bags in the back, both visible there and

8    then down in the floorboard also, Your Honor.

9              THE COURT:  You are saying it's shelled corn?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And the vehicle that they were in was

12   what?

13             THE WITNESS:  It was a minivan parked in the

14   driveway of the residence, and we -- when we asked his --

15   him about them, his wife said that he was a hoarder and that

16   they were in the vehicle.

17             THE COURT:  Do you know whose van it was?

18             THE WITNESS:  I believe that Officer Howlett ran

19   the registration, and it came back to Mrs. Childers, but I'm

20   not a hundred percent certain if Mr. Childers was not also

21   on the registration.  And, Your Honor, I did observe

22   Mr. Childers drive that van to the initial court appearance

23   last -- when we had the initial appearance in Newport News.

24   BY MS. STERLING:

25   Q.  Do you happen to know --

Mena, C. - Direct                                                    98

```
 1              THE COURT:  Hold on, Ms. Sterling.
 2              MS. STERLING:  I'm sorry, Your Honor.
 3              THE COURT:  I'm going to overrule the objection and
 4     admit Government's Exhibit 8 into evidence.
 5              MS. STERLING:  Okay.  Thank you.
 6              (The document was received in evidence as
 7     Government's Exhibit No. 8.)
 8              THE COURT:  You may proceed.
 9              MR. ROBERTS:  Thank you, Your Honor.
10     BY MS. STERLING:
11     Q.  One last question.  The federal state laws and
12     regulations, what is their purpose?
13     A.  The purpose is to not have an unfair advantage to the
14     hunter.  Migratory birds migrate from Canada south, and
15     during their migration they are in search of habitat and food
16     to shelter during that migration.  It's an unfair attractive.
17     Migratory birds are attracted to other birds feeding and also
18     to shelter.
19              What it creates is an area where a large number of
20     ducks would not normally congregate, and they don't shy away
21     from those areas even when hunted.  You can often, when a
22     baited area is being hunted, will often observe birds being
23     shot at, fly away, and immediately return to the baited area.
24     Q.  And are you familiar with the fact that the law has
25     changed over the years as far as --
```

Mena, C. - Direct                                                    99

1    A.  Yes, ma'am.  We received training on that while in our

2    advance class at the Federal Law Enforcement Training Center.

3    Q.  Okay.  And the statute as it stands now in the regulation

4    on baiting state that the defendant -- or the person accused

5    of baiting knew or should have known that the area was

6    baited, correct?

7    A.  Knew or reasonably should have known, yes, ma'am.

8    Q.  Reasonably should have known.  And it also specified, and

9    correct me if I'm wrong, I'm reading from the C.F.R.

10   20.11(j), the definition of baiting says that, "Any such area

11   will remain a baited area for ten days following the complete

12   removal of all such grain or other feed."

13   A.  Yes, ma'am.

14   Q.  And so what is the purpose of that?

15   A.  The purpose of that is that the migratory birds will

16   often continue to return to an area, even though the bait has

17   been removed, thus creating that unfair advantage, again, to

18   the hunters.  And it's a period of time to allow baiting area

19   to then be hunted legally once that grain or salt has been

20   removed and 10 days have been waited to be hunted.

21   Q.  Okay.  And when you say that the bait has been removed,

22   how would that be removed?

23   A.  Either by a person or physically removing it or by ducks

24   or other wildlife consuming it.

25   Q.  Okay.  And so if a hunter were familiar with the fact

```
 1    that there was grain in the area and/or that it was baited --
 2           MR. ROBERTS:  Judge, I think she's leading, just a
 3    wee bit, the witness.
 4           THE COURT:  Well, let's hear the question first and
 5    then we can decide whether there is an objection.
 6    BY MS. STERLING:
 7    Q.  And in order to determine whether it was removed, you'd
 8    have to go look, correct?
 9    A.  Yes, ma'am.  You'd have to physically inspect an area to
10    determine whether it was baited or not.
11           MS. STERLING:  That's my only question, Your Honor.
12    Thank you.
13           THE COURT:  Cross-examination.
14           MR. ROBERTS:  Yes, sir.
15                       CROSS-EXAMINATION
16    BY MR. ROBERTS:
17    Q.  Good afternoon.
18    A.  Good afternoon.
19    Q.  It's true, isn't it, that in your interview on February
20    the 5th Mr. Childers denied knowing there was bait in the
21    area where he was hunting, correct?
22    A.  He denied knowing that there was bait on the day that he
23    hunted on January 19th, 2019.
24    Q.  And, in fact, his discussion about baiting on that creek
25    indicated to you that he knew it was somewhere but not
```

Mena, C. - Cross                                                          101

1   necessarily the area where he was hunting, correct?

2   A.  His statements were that he knew that someone had put

3   bait out on Gordon Creek in the area around where he was

4   hunting.  Specifically, the specific spot where he was

5   hunting, I don't know.

6   Q.  All right.  Well, we've been provided with a CD of your

7   interview.  You taped it, correct?

8   A.  Yes, sir.

9   Q.  My notes indicate this interview went on for 35 minutes,

10  according to what I was able to --

11  A.  Yes, sir.

12  Q.  Is that about right?

13  A.  That's about right.

14  Q.  At 1735 in the interview he admitted to knowledge of

15  someone in the area of baiting somewhere.  If that is what

16  the tape said, that would be accurate, correct?

17  A.  Correct.

18  Q.  All right.  And he rejected the accusation that he had

19  put the bait up, correct?

20  A.  He said he knew who put the bait up but he would not

21  provide the name of the individual.

22  Q.  Well, he said he did not put the bait up, correct?

23  A.  Correct.

24  Q.  Okay.  Let's talk about the regulation and what's

25  considered a baited area.  Officer Howlett has indicated the

1   last time that my client was seen in this area was on
2   December 27th.  Are you aware of that, in reviewing his
3   report?
4   A.  I am aware.
5   Q.  And you have no knowledge to any other arrival or
6   presence of Mr. Childers other than the 27th prior to the
7   19th, correct?
8   A.  No, sir.
9   Q.  Okay.  And so from -- assuming there was bait there on
10  the 27th, the -- it is long past the ten-day provision in the
11  regulation that the bait would still be expected to be there
12  on the 19th, correct, without putting more bait out?
13  A.  I'm not understanding your question, sir.
14  Q.  Well, the government wants us to believe that
15  Mr. Childers knew the bait was there on the 19th, correct?
16  If I was there on the 27th and saw bait and waited till the
17  19th of January, considering all the conditions on Gordon's
18  Creek, which include tidal area, muddy area, windy area,
19  water fowl there, it's reasonable to assume that it would be
20  gone by the 19th of January, isn't it?
21  A.  It would be reasonable to assume it was gone but on the
22  19th there was a sample of bait --
23  Q.  I understand that.  I understand.  Mr. Childers had no
24  problem agreeing to speak with you when you went to interview
25  him, correct?

1   A.  No.  He spoke with me.

2   Q.  Now, you said you have been an agent since -- how long

3   has it been, excuse me?

4   A.  August of 2011, and I've been a federal employee in this

5   line of work since January of 2001.

6   Q.  How many baiting cases have you investigated in the

7   course of your career, do you know, roughly?

8   A.  Be involved with total?

9   Q.  Investigated.

10  A.  15, 20.

11  Q.  All right.  And have any of them ever been in regard to

12  bait on a tidal creek like Gordon Creek?

13          MS. STERLING:  Objection to the relevance, Your

14  Honor.

15          THE COURT:  Sustained.

16  BY MR. ROBERTS:

17  Q.  Well, those baiting cases that you investigated before

18  this one, they involved fields, did they not?

19  A.  Fields, swamps, and tidal creeks.

20  Q.  And so you know, do you not, that the removal of the bait

21  called for in the regulation, the 10-day period where you

22  have to wait until it's removed before it is considered

23  unbaited, can occur in ways other than the ducks and someone

24  removing it, correct?

25  A.  Correct.

1   Q.  Well, you told Ms. Sterling there were two ways it could

2   be removed; either by the ducks eating it or by people.

3   There are other ways, correct?

4   A.  Yes.

5   Q.  And that includes the tide?

6   A.  Yes, sir, the tide could remove it.

7   Q.  The mud could remove it, it could sink where it wouldn't

8   be visible, correct?

9   A.  Yes, sir.

10  Q.  Wind could blow it if it was on the surface so that it

11  wouldn't be visible, correct?

12  A.  Correct.

13  Q.  And other animals other than water fowl consume these

14  types of bait as well, do they not?

15  A.  Yes.  I said wildlife.

16          MR. ROBERTS:  Thank you, Officer.  No further

17  questions.

18          THE COURT:  Anything further?

19          MS. STERLING:  No, Your Honor.  Thank you.

20          THE COURT:  Special Agent Mena, the regulation,

21  just to clarify to me, this 10 day, what does it specify?

22          THE WITNESS:  Your Honor, it specifies that an area

23  shall remain baited until ten days after all of the feed and

24  grain has been removed.

25          THE COURT:  So if an area is baited, it shall be

1   deemed to remain as such until 10 days after it has been

2   removed?

3          THE WITNESS:  Yes, Your Honor.  And in this

4   instance the bait was present the day of the hunt.

5          THE COURT:  I understand that.  Thank you.  You may

6   step down.

7          THE WITNESS:  Yes, sir.

8          MS. STERLING:  Your Honor, I do have a copy of the

9   regulation if the Court would like to look at it.

10         THE COURT:  Yes, please.  If you will hand that to

11  the court security officer.

12         You may step down, Special Agent Mena.

13         THE WITNESS:  Thank you.

14         (Witness excused.)

15         THE COURT:  Any further witnesses for the

16  government?

17         MS. STERLING:  No, Your Honor.  That would be our

18  evidence.

19         THE COURT:  All right.  And are you resting?

20         MS. STERLING:  Yes, we are.  Thank you, Your Honor.

21         THE COURT:  Very well.

22         All right.

23         MR. ROBERTS:  The defense rests, if it please the

24  Court.

25         THE COURT:  I'm sorry?

```
 1            MR. ROBERTS:  We rest.

 2            THE COURT:  Very well.  No evidence from the

 3    defense, then?

 4            MR. ROBERTS:  Not at this point.

 5            THE COURT:  Well, it's --

 6            MR. ROBERTS:  Well, if there is a sentencing event,

 7    I would --

 8            THE COURT:  Understood.  Okay.  All right.  I'll be

 9    happy to hear any arguments you have.  I don't know if you

10    want to advise the witnesses that they may reenter.

11            MS. STERLING:  Oh.  Shall I do that?

12            THE COURT:  Jackie, would you mind just telling

13    them they are free to come back in the court.

14            MS. STERLING:  Sorry, Your Honor.

15            THE COURT:  Let me read this regulation while they

16    are doing that.

17            MS. STERLING:  Yes, sir.

18            (Pause)

19            THE COURT:  All right, Ms. Sterling.  The

20    government has the burden of proof.  I'll be happy to hear

21    any argument you have.

22            MS. STERLING:  Thank you.  Your Honor, Mr. Childers

23    is charged with taking or attempting to take migratory game

24    birds by the aid of baiting on or over any baited area where

25    a person knows or reasonably should know that there is or
```

1    has been baited.

2           The government would submit that the evidence in

3    this case is not only sufficient, it's absolutely

4    overwhelming.  When Officer Howlett received information

5    about a baited area, he went out on December 23rd.  He

6    checked out the scene.  He noticed that there was bait in

7    the water.  He took photos.  He put up that surveillance

8    camera, obviously, with -- with these types of cases,

9    enforcement is a problem.  We don't have enough officers to

10   cover all of the area, so they put up cameras.  They see

11   through that camera during the period that they are up, that

12   it was Mr. Childers and just one other person who went down

13   there.

14          Mr. Childers went down on December 27th.  He went

15   down from the edge of the property down to where the creek

16   is.  Again, I think it's important to remember, this is not

17   an area where people are normally hunting because it's a

18   residential neighborhood.  The lot which he had to cross

19   over to get there was owned by a private company.  It was a,

20   presumably, a residential lot that had not yet been sold.

21   But they came in to the neighborhood.  The neighborhood is

22   posted as no trespassing.  So this is not an obvious place

23   that somebody would go to hunt.

24          You wouldn't just pick it, particularly because

25   Mr. Childers, by the testimony, is a member of a hunt club

1    farther down on Gordon Creek.  There is no reason in the

2    world why he could have gone there.  And so when Officer

3    Howlett is there on the 16th of December, and he sees the

4    bait that he said was clear to the naked eye, it is hard to

5    believe that on the 27th, the very next day when

6    Mr. Childers went down there, that he didn't see the same

7    thing.

8            It's not only hard to believe, it's impossible to

9    believe.  I don't know what he was doing down there.

10   Mr. Roberts suggested he was scouting.  Perhaps that is the

11   case.  Since he came back, it seems quite logical that he

12   went down there to check it out.  It's curious to the

13   government why he went there in the first place where he

14   could have gone someplace else.  He could have gone to

15   this -- to a blind.  He could have hunted somewhere else.

16   But he chooses to come into this park/residential

17   development and go down and look there.

18           Officer Howlett told the Court that they left the

19   cameras up for about 10 days.  They didn't see -- there was

20   one other individual who was there other than Mr. Loss.  So

21   it's not like a common hunting area that everybody in the

22   area is going to.  It was unusual.  In and of itself, it's

23   unusual for him to go down there to go hunting.

24           And when you look at the evidence, it's hard or

25   impossible not to conclude that the reason he is down there

1    is because he does know it's baited.  He admitted when he

2    talked to Howlett and Officer Mena that he knew someone had

3    been baiting down there, someone had been baiting in Gordon

4    Creek.

5         He must have known it was that area because he

6    picked that area over the area where all the hunt clubs were

7    farther down the way.  And even if you were to believe that

8    the grain was there because of a residence farther up the

9    creek or even farther down the creek were feeding ducks,

10   what Officer Howlett tells you is that feeding ducks, the

11   amount of grain that was in the area which he observed in

12   the area where the hunting occurred in December and January,

13   that amount of grain was inconsistent with runoff from

14   people who were feeding ducks.

15        So, again, it just seems overwhelmingly the case

16   that Mr. Childers knew it was being baited, and that's why

17   he showed up there.  He would have seen it on the 27th

18   because the -- Officer Howlett saw on the 26th.  After the

19   cameras were put up, Officer Howlett goes back on the 18th

20   of January, and he told the Court there was more out there,

21   and it looked like it had been replenished.  So somebody is

22   looking at this area as an area that's good for duck hunting

23   because it is baited.  Somebody is baiting the area.

24        And so Mr. Howlett sees nobody hunting on that day.

25   He just -- did take a bait sample, which we provided a

1    photograph of that to the Court.  Then he goes back on the

2    19th and he goes back to this same area, and when he gets

3    there, again, you know, he tells the Court that it's

4    obviously baited.  He says that when he stands next to the

5    boat that Mr. Childers came in on from farther down the

6    creek, he can see it, and it's very clearly there.

7            So it was no change between the 18th of January and

8    the 19th of January.  It was clearly baited.  And it had

9    been baited -- just had been baited in January just as it

10   had been at the end of December.

11           So if you look at the statute, it is inconceivable

12   that Mr. Childers either didn't know or should not have

13   known about the baiting.  By his own statements he says he

14   knows the person who baited there.  He told Officer Howlett

15   on the day in question, I didn't do the baiting so we should

16   be okay.  But I know the person who put it out there but it

17   wasn't me.  That is what he told Officer Howlett.

18           He didn't repeat that statement to Officer Mena,

19   but he did say, yes, I know the -- I know someone who is

20   baiting, you know, between the split.  The fact that he

21   knows that baiting is going on during the split, which is --

22   he goes out there to look on the 27th where there is bait in

23   the water, and the split is between December 1st and the

24   19th, somewhere around that area.  This is a long period of

25   time here where anybody having contact with the water sees

```
 1    the bait.  And, again, as Howlett says, it's clear to the
 2    naked eye the area is baited.
 3         So based upon all of the evidence provided by the
 4    investigation by Officer Howlett and the statements of
 5    Mr. Childers, absolutely inconceivable that he did not know
 6    or should not have known, because he had knowledge of the
 7    area, he's an experienced hunting, he's been heard hunting
 8    migratory game bids.  In 43 years he is well aware of what
 9    the law is or should be.  It's inconceivable that he did
10    not, should not have known of the possibility of it being
11    baited, and what that means is that he had obligation to
12    check the area.
13         THE COURT:  What about this argument of the 10-day
14    period?
15         MS. STERLING:  The 10-day period means there was
16    never a period in time -- there was never a 10-day period
17    where we didn't find bait.  If you found bait on the 23rd
18    and the 26th of December, the ten-day period wouldn't start
19    to run until the bait was removed.
20         The bait was never removed.  In fact, Officer
21    Howlett said it looked like there was more bait in January.
22    So even if Mr. Childers thought, oh, it was back in
23    December, the fact that he knew that there was baiting in
24    the past created an obligation on his part to check and not
25    just check on the day of.  He should have checked before
```

1    because it's not just he could not have just shown up on the

2    date in question, the 19th of January and said doesn't look

3    like bait.  He would have had to have gone prior to that,

4    ten days prior to that to see if it had been removed.

5            And if he came back -- and after he went down and

6    saw that it had been removed, if he looked around, there was

7    no bait, he would still have to wait ten days.  He would

8    have to wait ten days because, as Officer Mena said, the

9    ducks are -- have a reflective tendency to return to the

10   area even when the bait is gone.

11           It's not a long period of time, and it's

12   inconceivable that he did not know or should have not known.

13   He should have known that the possibility of bait was there,

14   and it was his duty as a hunter to check that out.  We don't

15   know where he came -- whether he came between the 27th and

16   January the 19th, but we do know that the area was clearly

17   baited, and you can see from the government's evidence, very

18   unlikely that the bait seen so regularly during this period

19   had ever been removed, much less having been removed ten

20   days before January the 19th.

21           So, again, Your Honor, we would ask the Court to

22   find that the evidence is, in the government's opinion,

23   overwhelming.  I would note just as a historical point that

24   the baiting law was changed about 1998 because the statute

25   used to be strict liability.  There are a number of courts

1    that had a problem with that, including the Fifth and the

2    Fourth Circuit.  It was eventually changed, and it was

3    changed because the courts felt that there should be some

4    scienter.  It's not -- there should be some obligation on

5    the part of the -- some knowledge on the part of the hunter.

6    And that is why it is now drafted the way that it is, that

7    the hunter either has to know or reasonably should have

8    known.

9            An experienced hunter as Mr. Childers should have

10   known.  That knowledge should have prompted him to do an

11   inspection.  His failure to do so at the date on the date in

12   question on the 19th of January and times prior to that, and

13   because, clearly, the last time we know it was done was

14   December 27th.  It was clearly baited on that date.

15           His failure to inspect means that he has violated

16   the baiting law, as Officer Mena has testified.  The law is

17   there to make hunting a sport, to protect the birds.  It's

18   very important, it's very necessary, and Mr. Childers is

19   clearly in violation, and we would ask the Court to find him

20   so.

21           THE COURT:  Thank you, Ms. Sterling.

22           Mr. Roberts, I'd be happy to hear from you.

23           MR. ROBERTS:  I want to thank you for your patience

24   because, candidly, and apologize, if you're not a duck

25   hunter, this has been one of the most boring hearings I've

```
 1   ever --
 2            THE COURT:  I find it interesting.
 3            MR. ROBERTS:  Well, I'm glad, Judge.  I'm glad.
 4            THE COURT:  I learned a lot today.
 5            MR. ROBERTS:  Well, I'll tell you, I've been doing
 6   this for 40 some years.  There is still a lot I don't know,
 7   and I respect everything these gentlemen have done, and I've
 8   told them that.
 9            As you know, it's quite obvious they've got the
10   burden of proof.  We have rested, and so now we are at a
11   standard of whether they presented the evidence to prove the
12   case beyond a reasonable doubt.  Throughout her summary
13   Ms. Sterling talked about what they know, but I think the
14   evidence pointed out all of the things that they don't know,
15   Judge.
16            I would say, in trying to summarize my thoughts
17   without going over the evidence ad nauseam, which I hope I
18   have not done, this is either a case where my client baited
19   it, baited this area of the creek, and best he's aware,
20   there is no evidence of that.
21            THE COURT:  There is no evidence of that.
22            MR. ROBERTS:  All right.  It's then the other
23   option is that he did not bait it but that he was aware on
24   the 19th of January.
25            THE COURT:  Or the evidence requires prove that he
```

1    reasonably should have known on that date.

2            MR. ROBERTS:  Now, that's the next scenario.

3            THE COURT:  All right.

4            MR. ROBERTS:  I don't think they've proven that,

5    either, that he was aware.  The only thing they have, Judge,

6    is the statement made to Officer Howlett and Officer Mena.

7    Their proof can rise no higher than their own evidence.

8    Officer Mena correctly stated that his statement was that he

9    knew it was somewhere on Gordon Creek.

10           Remember this, please, that at the beginning of the

11   case when Officer Howlett testified, the length of this

12   creek, this tidal creek from the Chickahominy River to the

13   dam at Jolly Pond is somewhere between 5 and 10 miles of

14   tidal flow back and forth, back and forth.

15           So what was --

16           THE COURT:  Don't you have a problem with that,

17   though, given the fact that he was there on the 27th?  I

18   mean --

19           MR. ROBERTS:  Well, I was going to talk about that.

20           THE COURT:  Yeah.  I mean, conceivably it's true,

21   Gordon Creek is quite lengthy, and --

22           MR. ROBERTS:  Well, look at the map, Judge.

23           THE COURT:  It could be, you know, that it was

24   baited anywhere in that 5 to 10-mile stretch, but the

25   evidence before the Court suggests that on the 26th, when

1    Officer Howlett was there, that he saw bait, and that the

2    following day Mr. Childers was there, and very likely would

3    have seen bait that same day.

4            MR. ROBERTS:  Very likely but not proof beyond a

5    reasonable doubt because all Officer Howlett could say from

6    his game cams -- because he wasn't there -- was that he saw

7    Mr. Childers go down a path.

8            THE COURT:  Walking in that direction.

9            MR. ROBERTS:  He didn't say how far he got down to

10   the path, didn't say -- there was a camera on the creek as

11   well.  There is no evidence that the camera on the creek --

12   remember, those two cameras, one showing the road that goes

13   down to the creek and one showing the area of the creek.

14   There is no evidence that the second camera, the creek

15   camera showed that Mr. Childers was down there looking

16   around and sniffing around.

17           THE COURT:  Yes, but the -- I understand, and I

18   appreciate your argument on that, and I don't disagree with

19   you there, but the question is, you know, it requires the

20   Court to sort of suspend disbelief to believe that he would

21   have gone through this cul-de-sac, parked in this lot, and

22   then walked towards the creek, you know, without the purpose

23   of going to the creek.

24           MR. ROBERTS:  Well, I would just say --

25           THE COURT:  It requires me to suspend disbelief

1    that he would go there and then be found in that same place

2    hunting without, at a minimum, as you've suggested, or at

3    least argued, and this question of scouting.

4              MR. ROBERTS:  Right.

5              THE COURT:  Was he scouting there?

6              MR. ROBERTS:  That's the point I was going to make

7    because you don't go down to where the ducks are, where the

8    bait is, if you're scouting.  As a matter of fact, you want

9    to be as quiet and as unobtrusive and as invisible as you

10   can be to anything near the surface of the creek.

11             So, I mean, it's just as likely -- Ms. Sterling

12   said it's inconceivable he didn't know the bait was there on

13   the 27th.  It is conceivable.  But whether it requires

14   suspension of disbelief by the Court, I'll leave to you,

15   Judge.

16             THE COURT:  All right.

17             MR. ROBERTS:  The final scenario is, or the next,

18   is that he didn't bait but he should have been aware.  And I

19   would agree with the government's position, but for the

20   distance in time from the 27th of December to the 19th of

21   January, I would agree.  Because if this is a pond or a

22   stagnant river or a field that's flooded either

23   intentionally or by rain, that bait is not going anywhere.

24   It's not going anywhere unless the ducks eat it all up.  And

25   we haven't heard the numbers of ducks and geese and water

 1    fowl that you would expect to consume all the bait in that

 2    period of time.  Couple dozen mallards and some geese.

 3          And it's just as conceivable, and conceivable -- I

 4    think it's conceivable this roost area, a hunter sees some

 5    ducks, he thinks I'll come back here.  That's what we do.

 6    It's not a mine we're ready to hunt.  Well, let me ask you

 7    this, Judge.

 8          You're in a subdivision on the shore.  You think

 9    you may be in the subdivision or on the adjoining property.

10    You're going to go down there banging away at ducks with

11    neighbors and construction people and prospective buyers of

12    the watch.  You're going to go down there banging away at

13    ducks over bait where any one of them could pick up -- well,

14    I don't have it, but, you know, could pick up something and

15    go, 911, there's somebody firing away down here.

16          No, that's not conceivable.  At any rate, somewhere

17    it was baited; we don't know where.  Someone baited it; we

18    don't know who.  The date of the 19th is what's important.

19    That's 23 days after the 27th.  23 days after the 27th he

20    comes in by boat.  It's dark.  Officer Howlett said it

21    was -- he set up at 5:45.  Sunrise that day was at about

22    7:20, I think the evidence showed.  It's dark.  It's

23    wintertime.  And there is no evidence that there are

24    statements by the defendant out of the presence of the

25    officers, hey, boys, look at this, look at all this bait,

1    or, wow, we are really in for it.

2         The other evidence that they have to support this

3    is a baited hunter, no decoys.  I mean, we have already

4    explored that, I hope.  But you don't need decoys to duck

5    hunt if it's a roost or a certain type of area.  There is

6    also evidence that Mr. Hitchens, the neighbor, feeds and

7    baits the ducks.  Look at the map.  It's not far from where

8    my client was.

9         As a matter of fact, there is evidence he thought

10   he was on Hitchens property.  And in terms of removal of the

11   bait between the 27th and the 19th, Officer Mena summed it

12   up for us, I think, rather well.  Either the water fowl will

13   eat it, somebody goes in there and cleans it up, not bloody

14   likely.  The tide washes it away.  It sinks into the mud.

15   You see the picture of the marsh, how muddy it is there.

16   And it disappears, or the wind blows it one way or the other

17   where it's trapped and out of sight.

18        My position here is, Judge, and I'm not stretching

19   credulity of the Court, that he didn't bait it.  He didn't

20   know it was baited on the date that he come in.  And he had

21   no reason to believe it would be baited that long after he

22   was there on the 27th.  It was dark, and wind -- the most

23   damming evidence, I think they have, is that photograph --

24   and the Court questioned Officer Howlett -- was the bait in

25   the boat or was it in the water?  He's in the boat.  He said

1    there was bait all around.  It's in the water.  And he did

2    not return to that boat, from the testimony of Officer

3    Howlett, from the time he parked it or hid it over by those

4    trees, until the time he was questioned by Officer Howlett.

5    So how would he see what is, I think, a pretty damming

6    picture, all that Milo, those little grains all over -- how

7    would he see that?

8              They point out that he's been a duck hunter for 43

9    years.  He's going to take two kids, his son, to a place

10   where he's either baited, and I don't think we believe that,

11   or he knows they're bait, and yet he abides by every other

12   rule and law which are voluminous to be a duck hunter,

13   Judge.

14             You heard about all the checks that they did.  No

15   violations there.  Does that indicate someone who would be

16   lawless enough to take their kids and a stranger, or another

17   kid, out there and stand in the bait?  I don't think they

18   have proven it, Judge.

19             THE COURT:  Thank you, Mr. Roberts.

20             Anything further, Ms. Sterling?

21             MS. STERLING:  I will be brief.  Your Honor,

22   obviously, the Court knows it's not the burden of the

23   government to disprove every conceivable hypothesis of

24   innocence in this case.  Mr. Roberts has offered all sorts

25   of alternative explanations for what happened.

```
 1              The government would submit that those are not
 2    based on facts, and what has been concluded from all facts
 3    is that the defendant is guilty.  He does live in Seaford.
 4    That is 30 minutes away.  He's not -- he's not coming here
 5    because it's convenient to him.  But hunting, as far as
 6    everybody in the neighborhood hearing, this hunting is going
 7    on early in the morning before anybody would be expected to
 8    show up to work in the area.
 9              Clearly, the Milo's everywhere, he should have seen
10    it.  It was everywhere on the 19th, it was everywhere on the
11    18th.  If it was too dark on the morning of the 19th, and he
12    was going before sunrise, he should have gone the day
13    before.  And Officer Howlett was there the day before, and
14    he will tell you that the bait was everywhere.  So we would
15    ask for you to find him guilty.
16              THE COURT:  All right.  Thank you.
17              Thank you, counsel.  You may be seated.  I do find
18    it's an interesting case, and it's interesting how the law
19    has been constructed to deal with the issue and the
20    protection of migratory birds.
21              The statute requires, and the regulation requires,
22    that the defendant be shown to have taken any migratory
23    bird, or attempted to do so, and then he acted unlawfully in
24    doing so.
25              Unlawfully in this context requires proof beyond a
```

1   reasonable doubt that he took the bird and that he did so by

2   aid of baiting or on or over any baited area provided with

3   respect to that second proviso that he knew or reasonably

4   should have known that the area was baited.  The attorneys

5   have been arguing about that.  They understand that.  There

6   is no dispute here that he took a migratory bird and/or

7   attempted to do so.  The birds are shown in Exhibit 8, and

8   he admitted that he shot one of those two drake mallards.

9        The question is did he do so knowingly or

10   reasonably should have known that he was hunting over an

11   area that had been baited.  There is no dispute the area --

12   that there was bait in the area on January 19th while

13   Officer Howlett testified to that.

14        So the question is, you know, did the defendant

15   know or should he reasonably have known about the bait in

16   that area.  I find that the evidence does establish by proof

17   beyond a reasonable doubt that he either knew and/or

18   reasonably should have known that there was bait in the area

19   that he was hunting in on that date.

20        I would note that this area as shown in the

21   photographs, the baiting is not something that is hard to

22   notice.  It looks like the area was substantially baited,

23   and particularly this photo Government's Exhibit 3 showing

24   the log, this isn't the kind of wash that would move up and

25   down a tidal creek in these kind of volumes and just land on

1    top of this log.  If, in fact, you can see it on the creek

2    bed itself, but you just see incredible amounts of the bait

3    on the log as shown in this.

4            It's also shown clearly on the bed in Government's

5    Exhibit 2, as well, and Government's Exhibit 5.  But

6    relative to the 19th, that Government's Exhibit 3 was taken

7    the day before, and it shows that there was substantial

8    baiting.  This isn't adjacent -- immediately adjacent to

9    areas in which bait would have washed off agricultural

10   fields or even if, and I see no reason not to accept the

11   evidence suggesting that Mr. Hitchens may have fed ducks.

12           The map shows that his property is -- that seed

13   would have to travel a significant distance to get to the

14   area in which the hunting occurred, and particularly in the

15   volumes that the seed was found and shown, I don't accept

16   that this was simply a bait that arrived there by some other

17   reason.

18           The area was baited deliberately to attract ducks.

19   Significantly, the defendant and his son were in that area

20   on December 27th.  It's an area that is not closest to their

21   home.  It is 30 minutes away.  It is apparently an area --

22   generally, Gordon Creek is an area that the evidence shows

23   the defendant is familiar with by virtue of his membership

24   in a hunt club.

25           But to get to this particular area, he had to enter

1    a subdivision that has a no trespassing sign, go past that,

2    go to a cul-de-sac, and then drive from that cul-de-sac to

3    apparently a parking lot that's removed from the cul-de-sac

4    and then walk through -- from that parking lot area to the

5    creek area to, if not exam the creek itself, to scout the

6    hunting location.  We don't have to debate whether or not he

7    actually went down to the creek bed on the 27th or not

8    because the defendant himself said he knew that area

9    generally was being baited by someone.

10           The evidence that's before the Court suggests that

11    perhaps the story may have -- the testimony that or the

12    statements he made to officers may have changed a little bit

13    because when he's stopped on the 19th, his testimony --

14    and I'll review it more in detail -- was that he knew that

15    that area had been baited.  He said a person who -- he was

16    aware that a person had put bait but that person was not

17    hunting with them.  He knew there was bait there, and since

18    he did not put it out, he thought it was okay to hunt.

19    That's different than suggesting that, I thought someplace

20    else on the creek was baited or generally some other area of

21    Gordon Creek, which is 5 to 10 miles long, was baited as

22    perhaps would suggest that later on February 5th.

23           So when he's confronted at the scene, he says, yes,

24    this area has been baited by someone else.  I'm not going to

25    give you that person's name.  But I knew that there had been

1    bait there.  And he didn't state I thought it was gone or I

2    thought I waited long enough to be outside of the 10-day

3    period post removal.  He said since I didn't put it out

4    there, I thought it was okay to hunt, words to that effect.

5    I'm not quoting him verbatim but that is the import of the

6    testimony.

7            So I think that is very significant relative to my

8    finding of guilt in this case.  I'd also note, when he's

9    there on the 19th, it followed Officer Howlett's visit to

10   the site on the 18th in which he had indicated that the bait

11   appeared to be heavier and had been replenished, and as

12   indicated by that photo of the log which shows substantial

13   amounts of bait being placed in the area, presumably, to

14   attract ducks.

15           Now, on the 19th, there is no claim that the

16   defendant was jump shooting on that date, trying to sneak up

17   on the ducks quietly.  The motor was running, and the ducks

18   apparently jumped up in advance or upon hearing the motor.

19   They weren't pedaling into place.  I think it is significant

20   that no decoys were placed on that particular morning in

21   question.

22           I'd also find it significant that when the

23   defendant is visited soon after this incident, there

24   officers observed in plain view some -- it looks like

25   multiple bags of shelled corn in a van to which the

1    defendant had access in which he and/or his wife drove that
2    was on the property.  The shelled corn bags are visible.
3    They are ripped open, and apparently there were more than
4    just a couple in the car.
5          The defendant's statement to the officers is also
6    significant to the Court, as well, on that date.  So I think
7    the evidence is sufficient to show that he both did know
8    that the area -- that he was hunting over a bait area as
9    well as that he reasonably should have known that he was
10   hunting over a baited area on the 19th of January.
11         That's also made clear by what he says about the
12   boys, because he also told them that the boys had no
13   knowledge of the bait being in the area, which, again, is
14   suggested that he, in fact, himself knew that the bait was
15   in that area in which they were hunting that morning.
16         So I find the defendant guilty.  I find that the
17   government has met its burden of proof.  So that brings us,
18   then, to the sentencing phase of the case.
19         Ms. Sterling, do you desire to present any
20   evidence?
21         MS. STERLING:  No, Your Honor.
22         THE COURT:  Mr. Roberts, do you desire to present
23   any evidence?
24         MR. ROBERTS:  If I may, without objection, I would
25   just proffer about his employment.

```
 1          THE COURT:  Absolutely.  Come to the podium.
 2          MS. STERLING:  No objection.
 3          MR. ROBERTS:  If it please the Court,
 4  Mr. Childers --
 5          THE COURT:  Before you do that, let me also say the
 6  Court, in making its findings, considers the defendant's
 7  extensive knowledge of hunting and his history of hunting in
 8  making its findings today.  It isn't as if he was a neophyte
 9  who was out duck hunting for the first time.  He's someone
10  who is an experienced hunter, and, as you indicated, took
11  other steps to comply with the law but did not meet his
12  obligation with respect to the finding I've already made.
13          I'd be happy to hear you.
14          MR. ROBERTS:  Judge, thank you.  And thank you for
15  explaining your ruling and going into detail.  I appreciate
16  that.
17          Mr. Childers is self-employed.  The dump truck you
18  heard about is his dump truck.  He has a hauling business.
19  He's actually done work in this subdivision and others.  And
20  he lives there in Seaford with his wife.  He has a son that
21  was with him that day.
22          On the date in question Officer Howlett seized his
23  gun, all three guns.  The humiliation, embarrassment, and
24  expense that he's gone through in regard to this, hard to
25  understand all that, but -- and there are pending trespass
```

1    to hunt charges in state court as well.

2              THE COURT:  All right.  Thank you.  Then I'll be

3    happy to hear argument from the government, then we will

4    hear any argument from Mr. Roberts, and if Mr. Childers

5    wishes to say anything, I'll hear from him as well.

6              MS. STERLING:  Your Honor, Mr. Childers has been

7    hunting for over 40 years, and in that period of time he

8    is -- he's not a neophyte to hunting.  He is also not a

9    neophyte to hunting over bait.  He was convicted -- I'm

10   sorry, he was charged in 2003 by violation notice both with

11   baiting and hunting over bait.  It was his -- he was given

12   the opportunity to pay.  He did pay the forfeiture of

13   collateral, and so he does have those two convictions in

14   199 --

15             THE COURT:  You say two?  Is it one or two

16   convictions?

17             MS. STERLING:  Two separate offenses.

18             THE COURT:  In 2003?

19             MS. STERLING:  2003.  One for placement of bait,

20   and one is for taking migratory birds by aid of bait.  So

21   two charges, same incident, Your Honor.

22             THE COURT:  Very well.  It's the same date offense?

23             MS. STERLING:  Same date offense was December 17th

24   of 2003.

25             THE COURT:  Thank you.

1          MS. STERLING:  In 1996 he was convicted of -- or
2     he -- I'm not sure.  He may have paid the fine.  But he was
3     charged with possessing a white shot while hunting migratory
4     game birds.  He was found guilty, he paid a fine, is what
5     that indicates.
6          He's also, way back in 1995, before the law
7     changed, he was charged with hunting by aid of bait.  He was
8     found not guilty by Judge Bradberry.  I mention that only to
9     point out, he's familiar with the judicial process on these
10    cases, as well.  1995 would have been before the law
11    changed, and it's not -- he was not convicted.  But I point
12    that out to say he's -- he knows what's going on and how
13    this works.  Because of this, the government is particularly
14    concerned.
15         We would ask in this case that there be a fine.  I
16    think the collateral amount was a little over $1,000.  We
17    would ask for -- because --
18         THE COURT:  Is it 1,000?  I thought it was 500.
19         MS. STERLING:  I'm sorry.  You're right.  It's 500
20    for each, and we don't think that is sufficient.  He paid --
21    what I meant to say, Your Honor, he meant -- the last -- in
22    2003 he paid a total of $1,035.  That did not deter him.  We
23    would ask for a fine of $2,400, because this is a second
24    offense, and I want to emphasize to the Court our concern
25    about this being a second offense.

1          As the Court is well aware, hunting -- there is not
2    a lot of enforcement out there because we don't have enough
3    officers to watch after things, and so it's important that
4    when people are found to violate the law, the baiting deter,
5    but also that there be a matter of general deterrence.  Many
6    other people out there that know that when you hunt if you
7    are hunting over bait, you are going to pay a severe
8    penalty, and in that way, hopefully, people will be
9    deterred.

10          In addition to the fine, we would also ask that his
11   hunting privileges be suspended for a period of two years,
12   and that would include his not being allowed to hunt
13   anywhere in the world.  There was testimony that he does go
14   to Canada to hunt.  In addition to his not hunting --

15          THE COURT:  Are you asking that he be placed on
16   probation for that period of time?

17          MS. STERLING:  We would ask for unsupervised
18   probation as a condition of that primarily because I don't
19   know that reporting to the probation officer is the thing
20   that we are concerned about or that furthers justice in any
21   way, but we don't want him hunting.

22          We don't want him to assist anyone hunting or be in
23   the presence of anyone hunting, and we don't want him to be
24   able to apply for or obtain a permit or any other
25   documentation that would allow him to hunt for a period of

```
1   24 months.  And that is, Your Honor, because this is a
2   second offense.  I can't remember the last time I tried a
3   bait case in this court, but we did have recently another
4   case where someone pled guilty.  It was their first federal
5   bait conviction, and we asked for a one-year suspension.  We
6   are asking for the two years because this is his second.
7              THE COURT:  Thank you, Ms. Sterling.
8              MS. STERLING:  Thank you.
9              THE COURT:  Is there a processing fee that goes
10  with this case?
11             MS. STERLING:  It's, yes, a $10 special assessment
12  and a $30 processing fee, Your Honor.
13             THE COURT:  All right.  Thank you.
14             Mr. Roberts, I'll be happy to hear from you.
15             MR. ROBERTS:  The Court's made its decision.  It's
16  heard a lot of things about that day and the couple of weeks
17  before.  I'm not arguing about unsupervised probation.  I
18  think that's fair in this case.  The fine --
19             THE COURT:  You mean you don't want him supervised?
20             MR. ROBERTS:  I think that that would probably be
21  in the best interest of everyone.  I think it's a waste of
22  assets to supervise in this case.  I hope you agree.  I
23  think the fine should be higher, and I've said that to
24  Ms. Sterling.  I'm a water fowl hunter.  I think the fine
25  should be higher.  I told him that.
```

1          As for the hunting rights suspended, two years is a

2    long time for someone who has had the experience he has.

3    Granted, it is a second offense, but that was 16 years ago,

4    Judge.  He was a lot younger in them days, as we say.  I

5    remind you of what I think the humiliation and the

6    punishment must be to a man who has his son out there.  I

7    guess that's a double-edged sword.

8          Why would you take him out there, you're

9    responsible, but you've made your findings.  I would suggest

10   he's been punished already and will continue to be punished

11   as the state case proceeds, if the evidence there is

12   sufficient.

13         If you're going to consider suspending it, and I

14   suspect you are, I would ask for a year of suspension.  I

15   think that's sufficient, if it please the Court.

16         THE COURT:  All right.  Thank you.  Mr. Childers.

17         MS. STERLING:  Your Honor, if I -- I'm sorry, may

18   I?

19         THE COURT:  Yes.

20         MS. STERLING:  Your Honor, if the Court thinks that

21   24 months is too long, we would ask for at least 14.  That

22   would cover the entire hunting season.  It would be an

23   entire year of hunting.  The hunting season would end at

24   approximately January 19th or 20th.  So if it were to be a

25   year from this date, he would still be hunting in the next

1    hunting season, and we don't want that.  We would ask for a

2    minimum of 14 months suspension, Your Honor.

3            THE COURT:  All right.  Thank you.

4            Mr. Childers, if you will come to the podium with

5    your attorney.  You have an opportunity to address the Court

6    before sentence is imposed.  Is there anything you would

7    like to say here today, sir?

8            THE DEFENDANT:  No, sir.

9            THE COURT:  All right.  Mr. Childers, certainly,

10   it's, as someone who -- I don't duck hunt but I do fish, and

11   I do enjoy getting out in the wild and nature, and

12   apparently you do as well.  You have a long history of that.

13           It's disappointing to the Court that you've been

14   down this road before, and you're back here again having

15   been charged.  I'm not considering the charge for which you

16   were found not guilty in selecting a sentence, but having

17   been charged, having been charged with possessing a lead

18   shot, and then charged with hunting over bait and placing

19   bait in conjunction with hunting, admittedly, it has been a

20   while.  I will factor that in to the sentence, at least in

21   terms of any convictions, and there's no other evidence that

22   you've done this between 2003 and 2019 so I'm not going to

23   consider that.

24           But you shouldn't be here.  You should have learned

25   your lesson from this before, and it appears to the Court

1   that you haven't.  You're well past the age of which your

2   judgment should be formed about these things, and I'd like

3   to hope and think that you would have been, you know,

4   humiliated and embarrassed that this happened in front of

5   your son.  I know nothing about you one way or the other.

6          I don't know.  I think sometimes people feel like

7   it's a game of cat and mouse with these conservation

8   officers, and, you know, they're perfectly happy when they

9   don't get caught, and they blame the conservation officers

10  when they do get caught, and they're not happy about that.

11  So I don't know how you feel about this.  You haven't told

12  me.  That is your right not to tell me, so I make no

13  judgments about that.

14         But I would hope that what Mr. Roberts says is

15  true, that you want your children to be responsible hunters

16  and people who take wildlife responsibly and enjoy the

17  outdoors and do that.  Obviously, this isn't the right way

18  to go about teaching and imparting that lesson so that the

19  ducks will be around when your son is your age and when your

20  son wants to take his son duck hunting, that they will be

21  there.

22         That's really what this is about.  That is what

23  these laws are designed to protect, because I read a book

24  recently dealing with how the migratory bird treaties came

25  to be in effect.  It went through this history of talking

1  about fly tires.  Obviously, a real art to get these very

2  unique feathers, to tie flies that are incredibly unique and

3  involve feathers from very, very rare birds from all over

4  the world.

5        And what happened was that people were taking these

6  birds to get these feathers in part for fly tying but mostly

7  for clothing, that women wore these elaborate hats and

8  clothing with feathers, and they are apparently quite

9  beautiful, but they were killing off all the migratory birds

10  and these very rare birds, and it led to these treaties.

11        So the idea is that we want to preserve these

12  resources so the future generations can enjoy their beauty,

13  or whether they want to just watch the ducks swim or fly or

14  whether they want to hunt them and eat them because they

15  enjoy being outdoors and doing those things.

16        So you know that this is wrong.  I don't need to

17  tell you that.  It will be the sentence of the Court that

18  you are ordered to pay, having taken into account the

19  sentencing factors and the facts presented here today, a

20  special assessment of $30 -- I'm sorry, a processing fee of

21  $30, a $10 special assessment.

22        I am going to impose a fine of $1,200.  I am going

23  to place you on a term of probation for 14 months.  That

24  probation will be unsupervised but that doesn't mean that,

25  you know, conservation officers might be checking whether or

 1    not you've gotten a license to go hunting or gotten the

 2    stamps, and so forth, that you need to do that.  It will be

 3    conditions of probation that you are required to perform 75

 4    hours of community service.  I guess by imposing that, is

 5    that going to create an issue with supervision?

 6           MS. STERLING:  Well, we have to have some mechanism

 7    where it would be reported.  I don't mind if Mr. Roberts

 8    takes care of that and provides it to me and I provide it to

 9    the Court.

10           MR. ROBERTS:  I will be on his case, Judge, about

11    that.  I can even suggest some community service sites for

12    him.

13           THE COURT:  All right.  So the idea of that is

14    that, you know, that's in lieu of jail time.  The idea is

15    that we have to find other ways to, perhaps, get you the

16    message that you're not going to continue to do this in

17    spite of the history that you have.

18           So I'm going to direct that you perform 75 hours of

19    community service, that you notify your attorney, and that

20    he notify the United States Attorney if there is an issue

21    with that.  Then I'll ask the U.S. Attorney to bring that to

22    the Court's attention prior to the termination of the

23    14-month period of unsupervised probation.

24           Your hunting privileges will be suspended during

25    that time period.  You're not to hunt anywhere in the world

```
 1     during that time period.  And you, of course, are not to
 2     apply for any license or permit or stamps to engage in
 3     hunting during that time period as well.
 4            MS. STERLING:  I'm sorry, Your Honor.  We also ask
 5     that he not assist or be present with others who are
 6     hunting.  We don't want him to be in a situation where he's
 7     out in a blind, you know, saying that he's not hunting.  We
 8     don't want him to engage in anything related to hunting.
 9            THE COURT:  Right.  So it will be a condition that
10     you are not to be present around others who are engaged in
11     hunting, as well, during that 14-month period.  The idea is
12     that you're going to have to take a break from this either
13     directly yourself or engaging in it vicariously being around
14     others who are doing that as well.
15            MR. ROBERTS:  May I inquire, Judge?
16            THE COURT:  Yes.
17            MR. ROBERTS:  Can we define that as the act of
18     hunting because if you're -- I mean, what is hunting?  If
19     you're at the hunt club for a Thanksgiving dinner that they
20     are having or, you know --
21            THE COURT:  That doesn't sound like hunting to me.
22            MR. ROBERTS:  Well, I don't want anybody to mistake
23     what we are talking about.  I think the act of hunting would
24     fine tune it, if I may suggest.
25            THE COURT:  I guess the question is, if you're
```

```
 1    sitting in a blind, you know, and you're waiting four hours

 2    for some ducks to land in the field or on the water, you

 3    know, you're not actually hunting -- I don't know what the

 4    act of hunting is, then, you know.

 5          MS. STERLING:  That's why I said that he can't

 6    assist anyone with hunting or be present when others are

 7    hunting, present when they are hunting; not at a festival or

 8    not at a dinner kind of social occasion.

 9          MR. ROBERTS:  I guess we will just have to --

10          THE COURT:  I will ask the clerk to make the

11    condition in the form that Ms. Sterling said, not to assist

12    others and not to be present when others are hunting.

13          MS. STERLING:  When others are hunting.

14          MR. ROBERTS:  Thank you, Your Honor.

15          THE COURT:  I think it's reasonably clear as to

16    what that requires.

17          Is there anything further we need do in

18    Mr. Childers' case today?

19          MS. STERLING:  No, Your Honor.  Thank you.

20          MR. ROBERTS:  No, sir.

21          THE COURT:  Mr. Roberts, thank you.

22          MR. ROBERTS:  Yes, sir.

23          THE COURT:  Ms. Sterling, thank you.

24          MS. STERLING:  Thank you.

25          THE COURT:  Mr. Childers, good luck to you.  You
```

```
1    are going to receive some paperwork about these penalties,

2    and I expect you to pay them promptly, and if you don't,

3    obviously, that could constitute a violation of probation

4    about which you would not want to have to come back to

5    Court.  Do you understand that, sir?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Very good.  If there is nothing

8    further, then the Court will be in recess.

9              MS. STERLING:  Thank you.

10             (Hearing adjourned at 1:31 p.m.)

11                         CERTIFICATION

12

13        I certify that the foregoing is a correct

14   transcript, to the best of my ability, of the court's audio

15   recording of proceedings in the above-entitled matter.

16

17        X_____/s/_____x

18                    Jody A. Stewart

19             X_____1-6-2020 _____x

20                         Date

21

22

23

24

25
```